The judgment appealed from is therefore reversed in so far as it condemns C. A. Ransom, and the suit of plaintiff against C. A. Ransom is dismissed; and said judgment is otherwise affirmed. M. C. Baker to pay the costs of both courts.

———————

(64 South. 684.)

No. 19,486.

CADDO OIL & MINING CO. v. PRO-·· DUCERS' OIL CO.

(May 26, 1913. On Rehearing, March 16, 1914.)

*(Syllabus by the Court.)*

1. MINES AND MINERALS (§ 77*)—OIL LEASE—POTESTATIVE CONDITION.

A contract of lease, whereby the lessee agrees to drill for oil, under certain conditions, and does drill some wells, but not as many as contemplated by the contract, may be annulled by the lessor for a potestative condition, except as to the wells already drilled. As part of the contract has been completed, the potestative condition cannot be invoked as to that part, as the lessor had enjoyed all the rights to that extent that the contract gave him.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 204; Dec. Dig. § 77.*]

2. CONTRACTS (§ 273*)—REVOCATION—POTESTATIVE CONDITION.

Where a contract contains a potestative condition, this condition might be invoked for the annullment of the unexecuted part of the contract, although not affecting the executed part, especially where the contract is a divisible one.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1194; Dec. Dig. § 273.*]

3. MINES AND MINERALS (§ 78*)—OIL LEASE—PERFORMANCE.  .

Where a lessee agrees to drill a number of oil and gas wells on the leased land, the drilling of a few is not a fulfillment of his obligation.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 205–207; Dec. Dig. § 78.*]

4. SPECIFIC PERFORMANCE (§ 64*)—CONTRACTS ENFORCEABLE—DRILLING OIL WELLS.

The court will not undertake to order the specific performance of a contract to drill oil wells; as the nature of the undertaking is such that the court would not be able to supervise the work so as to enforce its decree.

[Ed. Note.—For other cases,· see Specific Performance, Cent. Dig. §§ 191–195, 198; Dec. Dig. § 64.*]

Provosty, J., dissenting.

### On Rehearing.

5. MINES AND MINERALS (§§ 73, 77*)—OIL AND GAS LEASE — CONSTRUCTION — VALIDITY — "POTESTATIVE CONDITION."

The provisions in an oil lease, which purport to impose the obligation on the lessee, being followed by the stipulation or condition: "It is expressly understood that the second party [lessee] reserves the right to abandon said premises whenever it desires to cease operations, and to remove all property placed thereon by it, at discretion."

*Held,* the condition is potestative; that is to say, it makes the execution of the contract depend upon the will of the lessee, thereby destroying the obligation imposed upon him, which was the "legal tie" that gave the lessor the right to enforce the contract; from which it follows that, there being no obligation resting upon the lessee, and hence no consideration moving to the lessor, there was no contract.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 201, 204, 210; Dec. Dig. §§ 73, 77.*

For other definitions, see Words and Phrases, vol. 6, p. 5476.]

6. CONTRACTS (§ 265*) — RESCISSION — CONDITIONS PRECEDENT.

Whilst, however, that which purports to be a contract may be without effect so long as it remains optional with one of the parties to execute or withdraw from it, a different condition arises when such party has actually complied with and discharged the obligation which, but for the potestative condition, would rest upon him, and the other party has accepted and profited by the advantage resulting therefrom; for, in such case, the party last mentioned cannot,

while retaining such advantage, be permitted to repudiate the obligation thereby assumed, and, without restoring the status quo, devest the vested rights acquired by the other party.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1187; Dec. Dig. § 265.*]

7. MINES AND MINERALS (§§ 73, 77, 78*)—OIL LEASE—CONSTRUCTION—CANCELLATION.

Whilst, primarily, the question of the expediency of further developing land upon which oil has been found in paying quantities is to be determined by the lessee, who must incur the expense and the risk of loss, the ultimate determination of that question, and of the obligation of the lessee in the premises, must rest with the court to which it may be submitted; and the rule upon the subject which seems to be most generally accepted and applied, and which appears to us to be well founded in reason and equity, is that it is an implied condition in all leases of land, for the production of oil that, when the existence of oil in paying quantities is made apparent, the lessee shall put down as many wells as may be reasonably necessary to secure the oil, for the common benefit of himself and the lessor; and whatever ordinary knowledge and care would dictate, as the proper thing to be done, may be required of him; the question being one mainly of fact, in which a court would necessarily be guided by the evidence submitted for its consideration. Even, however, if it were shown, in a given case, that there should be further development, under a particular lease, at a particular time, the rights acquired by the lessee, by reason of an investment already made, could hardly be devested merely because of a difference of opinion between him and the lessor as to the expediency of further development, and in the absence of allegation or proof of fraud or bad faith on his part, though, no doubt, upon proper allegation and proof, the lessor would be entitled to relief.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 201, 204–207, 210; Dec. Dig. §§ 73, 77, 78.*]

Breaux, C. J., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; E. W. Sutherlin, Judge.

Action by the Caddo Oil & Mining Company against the Producers' Oil Company to annul a gas and oil lease. From judgment for plaintiff, defendant appeals. Reversed on rehearing and ordered dismissed.

Hampden Story, of Shreveport, A. L. Beaty, of New York City, and Frank J. Looney, of Shreveport, for appellant. Blanchard, Barret & Smith, of Shreveport, for appellee. Thigpen & Herold, of Shreveport, amici curiæ.

BREAUX, C. J. This suit was brought by the Caddo Oil & Mining Company against the Producers' Oil Company for a decree annulling and setting aside a gas and oil lease.

Plaintiff owns 113.1 acres of land within a few hundred yards of Oil City, in Caddo parish. The land is in possession of the Producers' Oil Company under a contract entered into with plaintiff about the 18th day of March, 1907.

Plaintiff's contention is that the contract is illegal and null, because the Producers' Oil Company, in one of the clauses of the contract, expressly reserved the right to abandon the premises at will and remove all its improvements from the land. Plaintiff adds that the contract is totally wanting in mutuality, and furthermore that it is null because of the failure of the Producers' Oil Company to comply with the terms and conditions of the contract; that it did not drill wells for oil and gas, and did not explore the land for minerals; that the motive of the parties in entering into the contract was to exploit the lands for oil and gas.

The defendant answered, admitted possession, and claimed the right to hold the land under the mineral lease, as it has (it alleged) complied with all of its obligations. Defendant averred that plaintiff has received over $15,000 in royalties; that it has expended larger sums in exploring for oil on the land. Defendant pleaded that, by accepting these royalties, plaintiff is concluded and estopped.

The defendant drilled eight wells that were producing oil in limited quantities on the day that the suit was instituted, viz., April 29, 1911. The daily production of these wells was valued at $60.

Under the lease, defendant was obligated to begin drilling a well within 30 days from its date to a depth of not less than 2,300 feet.

In case of failure to discover oil, then a second well within 60 days thereafter, and, in default of defendant to bore as just mentioned, then the lease was to be decreed of no further force or effect. If, on the contrary, oil or gas was found, the term of the lease was to be 20 years from its date, and thereafter, if oil was found in paying quantities, the finding of oil in paying quantities was the time limit then of the lease.

It is in place to state that the land was in the oil and gas territory. Of late years, however, the oil has become exhausted. It has run into other underground reservoirs. At one time it was practically in the center of the oil fields. Wells have been drilled on all sides of plaintiff's ground. Since the lease was signed, the drillers find oil in other localities and the tract is not now in or near the center of oil production.

The defendant is unwilling to explore the land. Why not let it return to the possession of the owner? The company declined to drill other wells, giving, as a reason, that at this time there is no prospect of a fair return. Why hold to the land?

The superintendent of the defendant testified that the company left the development of the property to him.

Plaintiff repeatedly called on the defendant to drill other wells. This the defendant refused to do.

Defendant expended large amounts to bore and drill the eight wells, from which it derived scant profit. Only three wells now produce oil. At first, the quantity produced was large. Now the production of oil is worth only about $60 per day. The last producing well was bored about four years ago.

[1] As to these three wells, there is no ground to annul the lease. The potestative condition can be of no avail; for there is a performance of the contract as to these, and consideration received.

A contractee who has received full consideration cannot have a contract annulled, even if the condition is potestative. Busch-Everett Co. v. Vivian Oil Co., 128 La. 892, 55 South. 564.

This is not all; there are rules of pleading as binding as any other rule of positive law. By these the rights of parties must be determined.

The rule is that no amendment will be made to a judgment, unless appellee has prayed for it in his answer to the appeal. There was no oversight in this instance. The plaintiff purposely did not ask for an amendment of the judgment of the district court. It accepted it as rendered.

[2, 3] As to the three wells, defendant and appellant has no cause to complain. It has, as to them, all the rights it can ask. But the defendant goes further and seeks to have it decreed that performance of the contract as relates to the three wells is performance as to the whole area of the land. This would lead to the conclusion that the least performance of the least part of the contract is performance of the whole; that performance is entirely indivisible.

With this view we do not agree. The rights of parties are divisible; that is, having decided that defendant has the right to operate three wells, it has the right to ingress and egress from the wells, also the right to maintain its pipe lines. That is all. But the recognition of the right in defendant to this extent does not necessarily include the whole tract.

True, the defendant has accepted the decision of the lower court as correct. The effect extends no further than the three wells before mentioned.

It is possible to put an end to a contract to drill for oil to the extent that the contract is unperformed, provided that the want of performance is of a character and extent as relates to the whole as to justify annulling the contract.

It remains: Defendant partially complied with its obligation, and, to the extent that it has complied, it is entitled to the benefit arising therefrom, but not further.

The agreement and averments of the lease confer the right.

The defendant, lessee, has the right to abandon the lease whenever it pleases. This was a reciprocal right, which plaintiff, lessor, could exercise. The contract as to its continuance was optional on the part of either the plaintiff or the defendant. There was no vesting of right in either plaintiff or defendant as relates to the unperformed part. In putting an end to the lease, the plaintiff had the equitable right to performance as to the remainder of the 113 acres.

Were we, for illustration, to consider that several thousand acres had been let, and that the lessee chose to explore only to the extent of one acre or less, it would be possible for the lessor to resume control of his unexplored land, even though he chose to recognize all of defendant's rights to the one acre.

We are informed by Thornton, in his work entitled "The Law Relating to Oil and Gas" (2d Ed.) § 169, p. 247, that, if the lease required conservative drilling of wells, a failure to drill all of them in time, will not necessarily be fatal to the whole lease. A producing well may keep a lease alive in part, but not necessarily the whole.

Defendant's insistence is that it has drilled four other wells. The answer is that they are worthless, dead wells, and dead wells will not have the effect of giving life to a lease. It is not because about four years ago defendant drilled those wells it gave it the right to abandon all attempts to bore for other wells, and, if possible, increase the production.

In a number of decisions it is laid down as correct that the potestative condition may be invoked by contractor or contractee.

The operations for oil having permanently ceased, the nullity of the unexecuted contract may be invoked.

The purpose was to exploit for gas and oil; the consideration was a fractional portion of the production of the wells. One-eighth is the part to which the grantor is entitled.

Neither law nor jurisprudence contemplate that the contractor shall be at liberty to permanently cease the exploitation of the land. If he does, it has been decreed a number of times that it amounts to an abandonment.

If there is cessation in the operation of wells, the contract fails in its purpose; it would be the retaining possession of private property without compensating the owner.

Oil and gas are unstable, and flow from their situs to an extent that they are not considered as part of the land before they are brought to the surface or reduced to possession. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304; Busch-Everett Co. v. Vivian Oil Co., 128 La. 893, 55 South. 564.

[4] As to specific performance: One of the rights suggested by defendant in the alternative: That action would afford no relief. One cannot be forced to drill a well for oil, as such operation would not be within the power of the courts to enforce. It would be subject to many contingencies. It is entirely impracticable. For that reason courts have invariably annulled contracts, and have not ordered specific performance in cases at all similar to the present case.

The possibility of recovering damages has also been suggested, also in the alternative; that is, if plaintiff was entitled to relief, suit for damages was the remedy. That action also is impracticable. The law provides for performance of these necessarily peculiar contracts, including fugitive oil and volatile gas, not for damages in case of nonperformance.

For reasons stated, the judgment is affirmed.

PROVOSTY, J., dissents.

### On Rehearing.

MONROE, J. [5] The petition alleges that defendant holds possession of the land which it describes—

"under what said company wrongfully claims to be a contract, entered into with petitioner on or about the 18th day of March, 1907; * * * that said so-called contract is not, and never was, a legal or valid contract, and is not, and never was, binding on either or any of the parties who signed same, because it contains the following stipulation:

"It is expressly understood that the second party [the Producers' Oil Company] reserves the right to abandon said premises [the land hereinbefore described] whenever it desires to cease operations, and to remove all property placed thereon, at its discretion; * * * that the contract referred to was, all the time, and is now, void for want of mutuality, and is null, because of failure on the part of said Producers' Oil Company to comply with the terms and conditions of the same, and because of the failure of said company to drill wells for oil and gas as contemplated, and to explore the land for the production of said minerals, which was the principal motive and purpose of the contract; * * * that said Producers' Oil Company is holding said land merely as tenant at will of your petitioner; * * * that said land is within what is known as the Caddo Oil & Gas Field; that wells producing oil and wells producing gas have been drilled in and on said land, and in and on land in the immediate vicinity thereof; and there is a strong probability that many wells producing oil and many wells producing gas in paying quantities could be drilled in and on said land.

"That, but for the wrongful action of said Producers' Oil Company in failing and refusing to restore possession of said land to petitioner, petitioner could have derived large revenues from said land, and can derive large revenues therefrom whenever possession of said land is restored to it; * * * that, by its wrongful action, the said Producers' Oil Company has damaged petitioner in the sum of $10,000, and will damage petitioner in the further sum of $1,000 for each and every month during which said Producers' Oil Company retains possession of said land."

The prayer is for a judgment directing defendant to restore possession of the land, and, to that end, "decreeing the nullity of said pretended contract of lease, and ordering its cancellation from the public records of Caddo parish"; and condemning defendant in damages.

The contract (or, as plaintiff terms it, "so-called contract") to which the petition refers reads, in part, as follows:

"That we, the Caddo Oil & Mining Company, * * * styled first party, * * * in consideration of the sum of $1 to us in hand paid by the Producers' Oil Company, * * * second party, * * * and for the further consideration of the terms and conditions hereinafter mentioned, have granted, bargained, sold and conveyed, and do, by these presents, grant, bargain, sell, and convey unto the said second party, its successors and assigns, all the oil, gas, coal, and water, and other minerals, in and under the following described tract of land, together with the exclusive rights of ingress and egress, at all times, for the purpose of drilling, mining, and operating for minerals, and to conduct all operations and lay all pipes necessary for the production, mining, storing, and transportation of the oil, gas, coal, water, and other minerals, or any of them, reserving, however, to the first party the equal ¼ of all the oil, produced and saved from the premises by flowing wells; that is to say, wells which flow of their own accord, unassisted by artificial pressure or pumps of any character, to the extent of 50 barrels in 24 hours, to be delivered at the well or in the pipe line, when established, to the credit of the first party, free of charge. Provided that, if it should become necessary, in the judgment of the second party, to apply artificial air or gas pressure, or other pumps, to said well to properly bring forth the oil in paying quantities, then and thereafter, in such case, the first party shall only retain ⅛ part of said oil produced and saved upon the premises, delivered free of charge to the credit of the first party. Fifty barrels of oil in 24 hours is considered a paying well."

The land is then described, and there are certain particular provisions in regard to coal, gas, and other minerals that might be discovered; after which come the following stipulations, declaratory of the amount of drilling contemplated by the contract, and of the rights of the parties in certain other respects, to wit:

"It is further agreed and understood that the second party shall begin drilling upon said premises within 30 days from this date, and shall continue, with due diligence, to bore said well to a depth of 2,300 feet, unless oil shall be found in paying quantities at a lesser depth. * * *

"It is hereby agreed and understood by the parties hereto that, in case said first well does not develop oil in paying quantities, then the second party shall begin drilling a second well within 60 days after the completion of the first, or this contract shall be deemed of no further force or effect, and the said lease, land, minerals, and rights herein referred to shall revert back to the first party, and second party shall have no further interest therein.

"In case oil, gas, or any other mineral shall be discovered by second party on the premises herein described, then this contract shall be in force and effect for a period of 20 years from this date, and as much longer as minerals are produced from said premises in paying quantities; provided, if only gas is produced, $500 per year to be the minimum price to be received by the first party. * * * It is expressly understood that the second party reserves the right to abandon said premises whenever it desires to cease operation, and to remove all property placed thereon by it, at discretion. * * *"

Under our law, the condition last above quoted is clearly potestative; that is to say, it made the execution of the contract depend upon the will of the defendant (C. C. 2024), thereby destroying the obligation which defendant had assumed, and which was the "legal tie" that gave to plaintiff the right to enforce the contract. C. C. 2024; Pothier Obl. §§ 1, 205. And, as the payment of the $1 cannot be regarded as a serious consideration entitling defendant to withdraw, at will, it follows that, there being no obligation resting upon the lessee, and hence no consideration moving to the lessor, there was no contract. C. C. 2034; Murray v. Barnhart, 117 La. 1023, 42 South. 489; Goodson v. Vivian Oil Co., 129 La. 955, 57 South. 281.

[6, 7] Whilst, however, that which purported to be a contract was without effect so long as it remained optional with the defendant to execute or withdraw from it, a different condition arose when defendant actually discharged the obligation which, but for the potestative condition, would have been imposed upon him, and plaintiff accepted and profited by the advantage resulting therefrom; for plaintiff cannot, whilst retaining such advantage, or, in case of its inability to reinstate the status quo, be permitted to repudi-ate the obligations thereby assumed. Murray v. Barnhart, supra; Anse La Butte Oil Co. v. Babb, 122 La. 415, 47 South. 754; Busch-Everett Co. v. Vivian Oil Co., 128 La. 887, 55 South. 564.

We therefore inquire, What obligation did the supposed contract purport to impose upon the defendant, and what has it done towards the discharge of the same? Referring to the instrument which was signed by the parties, it will be seen that defendant was required, in terms, only to begin drilling within 30 days from the date. of the contract, and "to continue, with due diligence, to bore said well, to a depth of 2,300 feet," unless oil in paying quantities should be found at a less depth; and, in the event of nonsuccess in the first attempt, to begin the drilling of a second well within 60 days after the completion of the first. It will also be seen that the instrument in question contains the express stipulation that—

"50 barrels of oil in 24 hours is considered a paying well."

Beyond that, however, the instrument contains the recital that the grant is made to the defendant "for the purpose of drilling, mining, and operating for minerals," etc. And it is conceded that it was within the contemplation of the parties, and inheres generally in such contracts, that, if the reasonable and proper development of the field of operations should so require, other wells than those specifically mentioned should be drilled. The question then is: Has the defendant complied with the obligations thus expressed and implied?

It is shown beyond dispute that, up to July, 1909, when the last well was drilled, and which was less than two years prior to the institution of this suit, defendant had drilled eight wells upon the land in question, from which plaintiff had received revenues in the way of royalty, concerning which its secretary says:

"They vary considerably depending upon the production. We have received as high as a fraction under $1,000 per month, * . * * several years ago, and we now run from $60 to $120, or $130—along there"—per month.

Other witnesses testify that there were three wells producing at the time of the trial, and Mr. Lane, a stockholder, director, and former president of the plaintiff company, testifies that the aggregate production per day during the preceding year was about 60 barrels. It is clear, therefore, that the expressed obligation of the contract has been more than complied with by defendant.

As to the implied obligation, there were five witnesses examined in the case, of whom Mr. Barron, president of the plaintiff company, Mr. Lane, former president, now director and stockholder, Mr. Kerley, secretary, and Mr. Clayton, defendant's superintendent, were called by plaintiff (Mr. Clayton having been called as on cross-examination under the act of 1908), and Mr. McCue, defendant's former superintendent, called by it.

Mr. Barron testified that his company had insisted that defendant should prosecute the further development of the leased land; that he had been unable to get any satisfaction from defendant's officers; and that this suit had been brought because defendant had stopped the development. He was not asked whether the development already secured was sufficient or insufficient, and he expressed no opinion on that subject, and was not cross-examined.

Mr. Lane testified that he at one time had a conversation with Mr. Clayton, in which he said that he thought, if defendant would drill another well, this suit would be dismissed, and that Mr. Clayton answered that they did not propose to do it; that they had already spent a large amount of money in developing the property; but that they would be willing to clean the wells out, and thus make them produce better for a time. Mr. Lane also gave the following testimony:

"Q. Mr. Lane, you are one of the members of the Caddo Oil & Mining Company? A. Yes, sir; I am one of the stockholders and directors. Q. You were formerly its president? A.Yes, sir; up to two years ago, from its incorporation. * * * Q. You are familiar with the operations of the defendant company on the land leased that figures in this case? A. Yes, sir; I think I am a little bit more familiar with it than any one else in our company. * * * Q. Do you know of any other property around there that has been developed to the same extent as this property by drilling wells? A. Well, I have known some others, where there was a large production, developed more, but nothing with such a small production as that. Q. (by the court). I suppose he means the number of wells? A. Yes, sir; the number of holes drilled to produce the maximum amount of oil; to go and drill wherever there is a large production. You understand there is excessive drilling in such territory in order to divide up the oil between the companies. In this case there was really no one to drill against. The property never showed big—showed pretty fair property, but never showed big—showed to be very fair property though. * * * Q. I will ask you if you have gone and made any objection on the ground that this property was not fully developed? A. Well, I will tell you, Mr. Looney; men experience a change of mind in reference to property, according to developments on the borders. Now at one time I considered that they had really drilled more wells on the Caddo Oil & Mining Company's property than any one else would. At another time I thought they should have developed a certain corner, and they did it; put down No. 8. Now, as far as I personally feel about it, I think the property has been developed, reasonably developed, up to date, unless something is done on the border, and, of course, then I would expect them to set off."

Mr. Kerley testified that the leased land was, at one time, in the heart of the Caddo Oil Field, but is not so now, though the field in the vicinity is still active; that, in passing to and from a club of which he is a member, he observed that wells were being drilled in the neighborhood of the property in question, within a quarter and a half mile; and that he saw a derrick about 150 or 200 yards to the southward of the property. He was, however, unable to say, of his own knowledge, whether any of the wells to which he referred were producing oil, and he expressed no opinion as to whether or not the land in question has been reasonably or sufficiently developed.

Mr. Clayton (defendant's superintendent),

called by plaintiff for cross-examination, under the act of 1908, testified that he did not decline, for all time, to do any more drilling, but that, as representing defendant, his policy is to drill no more wells on the leased land, at present.

Mr. McCue testified that he had been defendant's superintendent up to about July, 1910, and was familiar with the land in dispute; that there have been eight wells put down, three of which are producing; that he felt that he had had as much experience in the Caddo field as any one, and that, from the conditions there and his experience as an oil man, he was of opinion that the development of the leased tract was complete; that he did not think that any other tract of like production had been so much developed.

A number of statements appear in the transcript which purport to show defendant's expenditures in developing the leased land, the quantity of oil produced, and the distribution of the oil, and the proceeds between the two parties to the lease. Thus we find the following:

|  | Barrels. | Amount. |
|---|---|---|
| Producers' Oil Company's seven-eighths of oil..................... | 98,333.52 | $54,805.08 |
| Royalty owners' one-eighth of oil | 28,136.75 | $15,920.10 |
|  | 126,470.27 | $10,725.18 |
| Total expenditure ........................... |  | $68,948.70 |
| Total our ⅞ earnings......................... |  | 54,805.07 |
| Loss ................................... |  | $14,145.63 |

We are unable to accept these figures as accurate, because, if ⅞ of the oil amounted to 98,333.52 barrels, ⅛ could not amount to 28,136.75; and, if ⅞ of the proceeds of the oil amounted to $54,805.08, (or $54,805.07, as stated in the lower figures), ⅛ could not amount to $15,920.10; and, whether the error is in the figures showing the ⅞ or in those showing the ⅛, we have no means of knowing. Possibly the plaintiff has received ¼, instead of ⅛, but there is no such explanation in the record. The figures showing the expenditures also require explanation,

since the itemized statement upon which the aggregate is predicated begins in 1906, whereas the lease bears date March 18, 1907. However, we think it may safely be assumed that defendant did not succeed in drilling 8 wells without paying something for it, and plaintiff does not attempt, by any evidence, to controvert the showing that it has thus far come out with a profit, while defendant has sustained a loss. It is quite evident, too, that, whether defendant's investment has proved profitable or unprofitable, and whether the amount invested has been $68,948.70, or less, or more, it has made an investment, as under the terms of the convention between it and plaintiff in which plaintiff has acquiesced, and from which it has accepted and retains a profit, and that the vested rights which defendant has thus acquired are entitled to rather serious consideration.

It will be observed that there is not a syllable of testimony in the record to the effect that the development, up to the present time, of the land in dispute has not been reasonably sufficient; but that, on the other hand, Lane, a stockholder and director of the plaintiff company, called by plaintiff as a witness, and wholly unimpeached, testified, without contradiction, that he knew more about the matter than any other member of the plaintiff company, and that, in his opinion, "the property has been developed, reasonably developed, up to date, unless something is done on the border," in which case he would expect the defendant to "set off." And McCue also, who qualified as an expert, testified that the development of the property is "complete," meaning, as we understand, with reference to the present situation.

We are referred to some decisions which are said to hold that, so long as the lessee, in a case such as this, is acting in good faith, "on business judgment," he is not bound to take the judgment of the lessor, or of any

one else, in preference to his own, upon the question of the expediency of the further development of the leased property by the drilling of additional wells. We take it, however, that what is meant is that the question mentioned is to be determined primarily by the lessee, who would incur the expense and the risk of loss, but we imagine that it could hardly be denied that the ultimate determination of such a question must rest with the court to which it may be submitted; and the rule upon the subject which seems to be most generally accepted and applied and which appears to us to be well founded in reason and equity, is thus stated in Thornton on Oil and Gas, § 111, to wit:

"It is an implied condition of every lease of land, for the production of oil therefrom, that, when the existence of oil, in paying quantities, is made apparent, the lessee shall put down as many wells as may be reasonably necessary to secure the oil for the common advantage of both lessor and lessee. Whatever ordinary knowledge and care would dictate, as to the proper thing to be done for the interest of the lessor and lessee, under any given circumstances, is that which the law requires to be done, as an implied stipulation of the lease."

Whether, in any given case, the rule thus stated has been complied with is, of course, a question of fact, in the decision of which a court must necessarily be guided by the evidence adduced; and, as in the case at bar the evidence shows that defendant has more than complied with the expressed conditions of the lease, and has fully complied with the condition referred to in the rule, it follows that plaintiff's demands should be rejected. To which we may add that, even were it shown that there should be, at this time, a further development of the property in question, we do not see how the rights of the defendant in the property could be devested merely because of a difference of opinion upon that subject between it and the plaintiff, and in the absence of allegation or proof of fraud or bad faith, though, no doubt, upon proper allegation and proof, plaintiff would be entitled to relief.

It is therefore ordered and decreed that the judgment appealed from be now avoided and set aside, and that there be judgment for defendant, rejecting plaintiff's demands, and dismissing this suit at plaintiff's cost in both courts.

BREAUX, C. J., dissents, for the reasons assigned in his opinion rendered on May 26, 1913, in this cause.