**BILLEAUD PLANTERS, Inc., et al.,**

**v.**

**UNION OIL COMPANY OF CALIFORNIA.**

**Civ. A. No. 4860.**

United States District Court
W. D. Louisiana, Opelousas Division.

Sept. 11, 1956.

Donald Labbe, Lafayette, La., for plaintiffs.

Cullen R. Liskow, Lake Charles, La., for defendant.

HUNTER, District Judge.

Plaintiffs seek damages for alleged drainage of gas from what is referred to as the "C" Sand. The alleged drainage took place between December, 1950 and February, 1954. The claim is based on an oil, gas and mineral lease dated March 4, 1944, granted by plaintiffs to G. L. Paret, and assigned by Paret to defendant on May 31, 1944. The original lease described the North Half of Section 32, Township 14 South, Range 5 East, and other land, but has been released except as to that 320 acres from which produc-

tion has been had since 1950 and as to which plaintiffs complain of drainage.

Defendant first filed a Motion to Dismiss the Complaint for Failure to State a Claim. The motion was not presented in advance of the trial and was repeated as the first defense in answer. The answer presents a general denial and by special pleas defendant opposes plaintiffs' claims under the provision of the lease (Paragraph 12) requiring demand and delays. Defendant also contends that, in any event, plaintiffs have received or will receive their "fair share" of the gas that has been and will be produced in the field from the "C" Sand, and therefore have sustained no damage.

■ The case is here under the Court's diversity jurisdiction and is governed by Louisiana law. Damages have never been allowed a lessor for drainage in Louisiana, but it is generally accepted that in a proper case a claim for such damage can be validly made. It is both fair and accurate to say that the provision of the subject lease requiring demand and delays (Paragraph 12) has never been judicially interpreted insofar as it relates to drainage. The question as to what constitutes "a fair share" of the gas from a given field, insofar as it relates to damages for drainage, has never been directly passed on by a Louisiana court.

The case was tried to the Court, without a jury, and the facts are found to be these:

(1) Plaintiffs are residents and citizens of the State of Louisiana.

(2) Defendant, Union Oil Company of California, is a foreign corporation, authorized to do, and at all times pertinent to this action doing, business in the State of Louisiana.

(3) Plaintiffs in this case seek to recover damages for alleged drainage of gas (from what is referred to as the "C" Sand) between December, 1950, and February, 1954; the claim being based on oil, gas and mineral lease dated March 4, 1944, granted by Billeaud Planters, Inc., to G. L. Paret, and assigned to defendant on May 31, 1944. When the lease was granted, Billeaud Planters, Inc., was the owner of the fee title and all mineral interests in the land; the mineral rights of the other plaintiffs were acquired thereafter.

(4) The lease originally described the North Half of Section 32, Township 14 South, Range 5 East, and other land, but has been released except as to that 320 acres from which production has been had since 1950 and as to which plaintiffs complain of drainage.

(5) There exists no unitization agreement integrating plaintiffs' land with the land of any other property owner; there are no unitization agreements or state orders integrating the various sands in the field; there are no specific state orders controlling the operation of the field besides the orders relating to the allowable take of gas therefrom.

(6) Defendant has been operating the field on 320-acre spacings established by it and accepted by the property owners. Consequently, this litigation involves the private rights of the plaintiffs as owners of 7/8ths of the mineral royalty and the rights and obligations of defendant.

(7) Defendant operates wells on various tracts in the Tigre Lagoon Field. It drilled a well on the Billeaud Tract (subsequently designated as Unit IX) in the year 1947 to a depth of 12,229 feet, traversing each of the three productive sands underlying the tract, namely, the "D" Sand, the "C" Sand and the "Planters" Sand.

(8) Thereafter, Union completed the Billeaud Well in the lowest sand (designated as the "D" Sand). Prior to December 1950 when pipeline production was begun in the field, Union had completed the following wells in the "C" Sand to a depth of approximately 11,500 feet:

(a) Aristide Broussard Unit VI— 660 feet west of Billeaud Tract.

(b) Edmund Dugas Unit VIII— 525 feet south of Billeaud Tract.

(c) P. O. Landry Unit X—approximately 1220 feet north of Billeaud Tract.

(d) Elodie Thibodeaux Unit II—approximately 2550 feet northwest of Billeaud Tract.

(e) Emile Broussard Unit VII—approximately 3000 feet south of Billeaud Tract.

(f) Noemi Broussard Unit XIII—at extreme north end of field.

(9) The Billeaud Well produced from the "D" Sand from December, 1950 until February, 1954. During that time the other wells hereinabove ennumerated produced from the "C" Sand, but not from the "D" Sand.

(10) There are no known faults which would interfere with drainage between Billeaud Well, Unit IX, and the wells described in Finding (8) hereof.

(11) Production from the three nearest adjoining wells ("C" Sand) during the period of time involved, December, 1950 to February, 1954, was as follows:

(a) Aristide Broussard Unit VI—96,898 barrels of distillate and 4,216,794 MCF gas.

(b) Edmund Dugas Unit VIII—127,028 barrels of distillate, 4,840,700 MCF gas.

(c) P. O. Landry Unit X—126,019 barrels of distillate, 4,979,849 MCF gas.

(12) The unit prices received by Union for the sale of condensate and gas from Tigre Lagoon Field from the beginning of production to February 22, 1954, were as follows:

### Condensate

| | |
|---|---|
| 7– 1–48 – 8–31–48 | $2.80 per barrel |
| 11– 1–50 – 5–18–51 | 2.75 per barrel |
| 5–19–51 – 6–14–53 | 2.90 per barrel |
| 6–15–53 – 2–22–54 | 3.15 per barrel |

### Gas

| Pressure Base | | |
|---|---|---|
| 15.025 | 11–1–50 – 3–31–51 | 7.647455¢ per MCF plus .2249¢ for dehydration Transco |
| 16.7 | 4–1–51 – 4–30–51 | 8¢ per MCF plus .25¢ dehydration from Transco |
| 15.025 | 5–1–51 – 6–30–51 | 7.197605¢ per MCF plus .22494¢ for dehydration Transco |
| 15.025 | 7–1–51 – 6–30–52 | 7.197605¢ per MCF plus .224925¢ for dehydration Transco |
| 15.025 | 7–1–52 – 2–22–54 | 8.797150¢ per MCF Transco 15¢ per MCF Fuel Sale to Others; 8.57225¢ per MCF Fuel Sale to Union Oil Co. |

(13) The gross value of the withdrawals by Union from the wells enumerated in Finding (11), after payment of severance taxes, was as follows:

| | |
|---|---|
| Broussard Well | $624,302.40 |
| Landry Well | $685,244.64 |
| Dugas Well | $673,342.08 |

(14) During the same period of time, the total value of the gas and condensate withdrawn from the "D" Sand in the Billeaud Well, after payment of severance taxes, was $523,531.20.

(15) The distance between Dugas Well and the center line of Section 32 running East and West is 525,513 feet, and such fact was known to Union in December, 1950.

(16) An offset well to the Dugas Well in the "C" Sand on the Billeaud Tract

would have produced substantially the same quantity of gas and condensate as was produced from the Dugas Well.

(17) The average royalty paid to the mineral owners of the three wells enumerated in Finding (13), for the period involved, was $85,662.84, and the ⅞ths of the average royalty which plaintiffs would have been paid, had they had a well in the "C" Sand at this time, would have been $72,359.91.

(18) Upon basic information, such as bottom hole pressures, porosity, and other data computed by them from careful study of the electric logs, etc., Dr. Huner and Mr. Montgomery testified that there had occurred a drainage loss (from the Billeaud Tract) in the "C" Sand of 2,897 MMCF of gas and 72,425 barrels of condensate. This applied to the unit prices set forth in finding (12) reveals the drainage suffered by plaintiffs to be as follows:

Billeaud Planters, Inc. $20,020.32
Billeaud Heirs $26,694.12

(19) Dr. Huner and Mr. Montgomery were exceptionally well qualified experts and computed the drainage as reasonably and correctly as it could be computed. We believe that their estimate of damage is reasonably certain and is accepted by the Court.

(20) Paragraph 14 of the lease agreement reads as follows:

"In the event a well or wells producing oil in paying quantities should be brought in on adjacent lands not owned by the Lessor and within six hundred sixty (660) feet of said land, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances."

(21) Paragraph 12 of the lease agreement reads as follows:

"In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has

breached this contract. If within sixty (60) days after receipt of such notice, Lessee shall meet or commence to meet the breaches alleged by Lessor, Lessee shall not be deemed in default hereunder. The service of said notice and the lapse of sixty (60) days without Lessee meeting or commencing to meet the alleged breaches shall be a condition precedent to any action by Lessor for any cause hereunder. Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder."

(22) On January 12, 1954, plaintiffs, by letter to defendant, demanded that some action be taken to prevent the alleged drainage from the "C" Sand. Immediately thereafter, defendant re-worked the well on plaintiffs' land, and it was re-completed on February 22, in the "C" Sand, 42 days after receipt of the demand of January 12, 1954, and has been since producing gas in paying quantities from that reservoir.

(23) While the testimony itself may not clearly show it, defendant necessarily knew that the Billeaud Well was producing from a different sand or horizon from that from which the adjoining wells were producing. Plaintiffs did not know this, but the information could have easily been obtained by them or on their behalf.

(24) There is no evidence that defendant attempted to hide the information. Defendant filed reports with the Conservation Department immediately upon completion of the wells, showing the different horizons, and although they were not then referred to as Sands "C" and "D", the reports so filed did show that the sands were different. (Exhs. D–4 and D–5.) The information was public and any reasonable person could have determined there were two sands merely by examining or having the Conservation Records examined.

(25) Defendant has not been guilty of any fraud or concealment, nor has defendant committed any other acts which tended to hinder, prevent, or impede plaintiffs from ascertaining the true facts relative their well and those adjoining.

### Discussion

■ It is both fair and accurate to say that the Louisiana Courts, for one reason or another, have never awarded damage for drainage of gas or oil. But the weight of authority as expressed by various text writers, supported by decisions from other oil producing states, and dicta from Louisiana decisions, support the general legal proposition that there is an implied obligation on the part of the lessee under a mineral lease to operate the lease for the mutual benefit of lessor and lessee, and accordingly, to prevent the leased land from being drained by wells on adjoining property; and if a lessee permits drainage to occur through his fault, the land owner may recover the value of the royalty of the oil and gas which has been drained from his land.[1]

The Court appreciates that under the doctrine hereinabove quoted, operators may be compelled to pay double royalty on the same gas and oil, because in addition to the royalties paid to the owners of the land on which the well is located, they may also have to pay royalties on the same production to one who proves drainage. But the authorities clearly indicate that if and when the precise question comes before the Louisiana Supreme Court, that Court will hold that there is an implied obligation on the part of the lessee under a mineral lease to operate the lease for the mutual benefit of lessor and lessee, and accordingly, to prevent the leased land from being drained by adjoining wells, and for a breach of that obligation the lessee is liable and accountable for the royalty on the portion of the oil and gas which he drains from beneath the leased premises, subject, of course, to the provisions of the lease contract itself. Because I am of this view, and because there was drainage here, it becomes necessary to pass to other considerations.

### "Fair Share"

Defendant, assuming but not admitting drainage, insists that there can be no damages here in any event, because according to them, plaintiffs have received or will receive their fair share of the gas which has been and will be produced in the field from the "C" Sand. Recourse to cited authorities reveals that the courts would allow damage only in those instances where plaintiffs do not receive their fair share of the total production from the common reservoir. However, the same authorities reveal that there is much uncertainty as to what is meant by "fair share."

Defendant, relying on Louisiana Gas Lines v. Burrow, 197 La. 275, 1 So.2d 518 and Coastal Club v. Shell Oil Co., D. C., 51 F.Supp. 819, says that plaintiff is entitled to the benefit of production from its land, which production should be equal to the proportion of the total production of gas from the field, to be determined by the percentage the 320 acres of land owned by plaintiff bears to the total acre-

---

1. Caddo Oil & Mining Co. v. Producers' Oil Co., 134 La. 701–717, 64 So. 684; Thornton Oil and Gas, 5th Ed. Sections 154, 155; Summers Oil & Gas, Vol. 2, pp. 309–338 et seq.; Para. 396, Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases, 2d Ed., page 23; 58 C.J.S., Mines and Minerals, § 209, p. 525; Roberts v. United Carbon Co., 5 Cir., 78 F.2d 39; Humphreys Oil Co. v. Tatum, 5 Cir., 26 F.2d 882; Thomason v. United Gas Public Service, 5 Cir., 98 F.2d 526; Dillon v. Holcomb, D.C., 28 F. Supp. 938; Tidewater Associated Oil v. Stott, 5 Cir., 159 F.2d 174, 175; Deep Rock Oil Corp. v. Bilby, Okl., 186 P.2d 823; Central Kentucky Natural Gas Co. v. Williams, 249 Ky. 242, 60 S.W.2d 580; Carson v. Ozark Natural Gas Co., 191 Ark. 167, 83 S.W.2d 833; Morriss v. Barton, Okl., 190 P.2d 451; Hartman Ranch Co. v. Associated Oil Co., 10 Cal.2d 232, 73 P.2d 1163; Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286, 19 A.L.R. 430; Bush Oil Co. v. Beverly-Lincoln Land Co., Cal.App., 158 P.2d 754; Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176.

age embraced in the reservoir. Then they proceed to argue:

"And based on the rule there laid down by the Supreme Court of Louisiana, plaintiffs, according to the evidence of the producing area, could claim no more than 7% of the total ultimate recovery from the "C" Sand reservoir. Since the completion of their well in that sand they received credit for several months on about 18% of the total production; since then their well has produced about ⅐th of the whole. The evidence is undisputed that the well will in all probability continue to produce for many years. And it is reasonable to suppose that before long plaintiffs will have received more than their "fair share" of the production from the field. They have made no effort to prove the contrary. And even if it might be surmised that in the end their production would be less, their complaint at this time, to say the least, is premature."

We agree with plaintiffs that too many geological factors are to be considered to accept the dicta in these two cases as being the law of Louisiana. We understand from the evidence that due to the higher structural position of the Billeaud Tract it may produce longer than the adjoining wells, but we do not believe that defendant can compensate plaintiffs' loss with this entirely speculative prospective production in the future. It is apparent that if the Billeaud Well should by chance produce longer than the neighboring well, it would be a benefit which nature afforded the property, and the Billeauds would get this tail-end production, even though they had received their fair share of the gas from January, 1950 to February, 1954. No water drive has yet developed in the "C" Sand, and no one knows whether one will develop in the future, and unless the water drive does develop, the higher structural position means nothing.

We believe that a fair share of any land owner is that which he may re-

cover from his land while complying with all the laws which control his operations. In other words, each land owner is entitled to "an opportunity" to capture oil and gas underlying his land. That opportunity arises when it becomes evident, as in this case, that the land is productive.

Plaintiffs themselves set forth two theories upon which to compute the measure of damages, to compensate for the loss accruing from a breach of the lease to prevent drainage. The first would award to the lessor the rents and royalties which would have accrued to the lessor if the lessee had fully complied with his contract. On this principle plaintiffs insist they would be entitled to $72,000 under Finding (17). Under the second theory, the lessee is liable and accountable for the value of the royalty on the portion of the oil and gas which he drained from beneath the leased premises.[2] It seems to me that weightier reasons support this latter method of ascertaining damage, and applying that theory to findings (18) and (19) plaintiffs would be entitled to recover $46,714.44. That is the amount of money which they actually lost as a result of drainage under the evidence here and under this Court's interpretation of "fair share."

### "The Condition Precedent"

The verbatim quotation of Paragraph 12 appears in Finding (21). According to the allegations of the complaint and proof, production of gas was being obtained in paying quantities from plaintiffs' 320 acres in 1950. That production prior to February, 1954, came from a reservoir known as the "D" Sand. In January, 1954, plaintiffs, by letter to defendant, demanded that action be taken to prevent the alleged drainage from the "C" Sand, and in February, 1954, within forty-two days, the well on plaintiffs' property was re-completed in the "C" Sand and production has continued therefrom up to the present time. The suit here claims damage for alleged drainage prior to the demand.

2. Phillips Petroleum Co. v. Millette, 221 Miss. 1, 72 So.2d 176.

Defendant insists that by fundamental rules of law [3] Paragraph 12 of the lease is the law between the parties, and that the notice of demand there required was and remained a condition precedent to any action by lessor for any cause under the lease contract.[4]

Plaintiffs peg their case on their contention that Paragraph 12 is not applicable. They present various reasons in support of their position, which may be summarized as follows:

(1) Defendant's action here was an active violation of the contract, since its obligation was not to do a certain thing.

(2) Defendant, having taken the position in this suit that it was not obligated to perform, must be considered to have waived Paragraph 12 relative to notice and demand.

(3) Defendant had knowledge of the breach, and plaintiffs had no knowledge thereof.

(4) The damage resulted from a tort.

■ Plaintiffs' first argument against the effect of Paragraph 12 is based on the assumption that there was an active violation of the contract, and that the defense is dependent upon the law found in Louisiana Statutes Annotated–Civil Code Articles 1932 and 1933.[5] However, these articles are not controlling when there is a positive contract provision to the contrary. They have no application where there is an express agreement that notice must be given at a specific time and in a specific manner.

Plaintiffs next urge that there was no necessity for the demand because defendant, on the merits in this suit, denied plaintiffs' demand. The effect of this argument would be to force the defendant to admit that it violated its obligations in order to have the benefit of the law between the parties, as expressed by them in the lease. Defendant cannot thus be cut off from its alternative defenses. We cannot help but observe that when the demand was made, defendant did comply, whether it was obligated to do so or not, so it is not in the mouths of plaintiffs to say that a prior demand would have been useless.

■ Plaintiffs next rely on the proposition that the suit here is both on contract and on tort, and that even if the provision of the lease relative to notice was binding on them as to the contract features of the case, it was not binding on them insofar as the tort phase of the case is concerned. The whole basis of the action is that defendant violated or failed to comply with express and implied obligations of the lease. Plaintiffs' cause of action exists because of the contract and for no other reason. Accordingly, it must be governed by the contract. The alleged cause of action asserted by plaintiffs has its origin in the lease and derives its vitality directly therefrom, and is governed thereby.

There remains the very complex problem of knowledge. Plaintiffs had no knowledge of the facts that a violation was occurring. Does this relieve them from the necessity of making demand? No case is called to our attention which, because of factual similarity, would serve to support the contentions of either of the here contending parties. Those cited by analogy are but as dust on a jeweler's scales. The Court agrees that in the absence of express requirement, the neces-

---

3. Articles 1901, 1945 and 1764 of LSA–Civil Code.

4. Actually, plaintiffs' case is based on implied obligations of the lease, as well as an active violation of Paragraph 14, but Paragraph 12 still controls, for it deals with the necessity of giving notice of violation, either express or implied.

5. Art. 1932 provides that when there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no duty to put the debtor in default, in order to entitle him to his action. Art. 1933 provides that when the breach of a contract has been passive only, damages are due from the time the debtor has been put in default. This rule is subject to certain exceptions not pertinent here.

-sity for notice ordinarily depends on whether the fact on which defendant's liability depends is exclusively within the knowledge of one party or another. But in the case now before this Court, there was an express requirement of notice and demand, neither excused nor waived.[6]

While the testimony itself does not clearly show it, defendant necessarily knew that the Billeaud Well was producing from a different sand or horizon from that which the adjoining wells were producing, but the record does show that it filed reports with the Conservation Commission immediately upon completion of the wells, showing the different horizons, and although they were not then referred to as Sands "C" and "D", the reports so filed definitely showed that the sands were different (see documents D–4 and D–5). The information was public and anyone could have determined that there were two sands merely by examining the Conservation Records. The evidence clearly shows that Mr. Bates did so determine from the Conservation Department in 1950 (Tr. 82 and 83). Plaintiffs' own witness, Mr. Montgomery, testified as to what his conclusions would have been in 1950 from the information then available, and he stated that he had based most of his conclusions on reports in the Conservation Department office (Tr. 54–60).

The Court does not mean to imply that this in itself should relieve defendant from all responsibility, and the condition precedent could and should be avoided if it is established that defendant, by some concealed activity or some overt act, prevented plaintiffs from obtaining the information necessary to place them in a position to make a demand, but I cannot conclude from the evidence here that the plaintiffs were deliberately misled. There is no evidence that defendant attempted to hide the information. Plaintiffs apparently gave the subject matter no thought, thereby allowing defendant to assume that they were satisfied with the operations from the "D" Sand, so far as the 320 acres were concerned.

A defendant should not be permitted to screen its own wrongdoings with a cry that plaintiffs are not entitled to damages so long as defendant could get away with the drainage without plaintiffs' knowledge, but it would be an obvious injustice for a land owner, knowing the facts, to remain silent and receive the royalty from the "D" Sand and then subsequently force defendant, in effect, to pay double royalty.

The Court believes that Colley v. Canal Bank & Trust Co., D.C.La., 64 F.Supp. 1016, affirmed 5 Cir., 159 F.2d 153, *by analogy only* is helpful in arriving at a just and equitable conclusion. In that case it was held that the mere fact that plaintiffs were ignorant of existence of their rights, because of defendants' conversion of corporate stock, did not toll the statute of limitations in the absence of allegation and proof that defendants actually concealed fact of conversion or committed other acts which tended to

6. We do not pass on defendant's contention set forth in his brief that:

"While paragraph 12 is the law between the parties, plaintiffs would be met by the same objection even if the lease was silent in that regard, for the Louisiana decisions have well settled the necessity for demand before suing for alleged violation of an implied obligation under a mineral lease.

" 'The defendants, lessees, meet the fourth ground of attack by averring that the plaintiffs did not make any demand upon them to further develop the property at their implied obligations. It appears that the leases do not contain any provision as to how many wells are to be drilled. The record shows that the defendant lessees are in possession of the property and are operating one producing oil well. Plaintiffs do not allege that they made any demand for further development or that they put the defendant lessees in default. In the absence of allegations and proof to that effect, plaintiffs are not entitled to have the leases cancelled on the grounds of failure to reasonably and further develop the leased premises. Pipes v. Payne, 156 La. 791, 101 So. 144; Hiller v. Humphreys Carbon Co., 165 La. 370, 115 So. 623; and Temple v. Lindsay, 182 La. 22, 23, 161 So. 8.' Brown v. Sugar Creek Syndicate, supra." See 195 La. 865, 197 So. 583, at page 593.

hinder, prevent, or impede plaintiffs from ascertaining knowledge of facts.

By analogy this Court holds that a demand was necessary and the mere fact that plaintiffs were ignorant of the drainage did not relieve them from the necessity of giving notice in the absence of actual concealment on the part of defendant, or some other act on the part of defendant which hindered, prevented or impeded plaintiffs from ascertaining knowledge of facts.

Before one can claim the right to damage for drainage, he must first comply with the specific requirements of the agreement of the lease and notice must be given in the time and manner required by the lease agreement. By this means, he puts the lessee on notice that he must take positive action, and that he, the lessor, will not continue to consent to delays because of the injury he is suffering through drainage. Otherwise the lessee might keep silent to the end and then demand, in addition to what they have received, the full measure of profit which could have been received had he put lessor on notice in the required manner. The "condition precedent" was not complied with. There was no legal reason to excuse compliance.

Accordingly, plaintiffs' cause of action (and their suit) should be dismissed. It is.

### Conclusions of Law

(1) The Court has jurisdiction of the parties and of the subject matter under the diversity statute. 28 U.S.C.A. § 332.

(2) The law to be applied is the law of Louisiana. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

(3) "Agreements legally entered into have the effect of laws on those who have formed them.

"They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

"They must be performed with good faith." Art. 1901, LSA–Civil Code.

(4) "The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect." Art. 1903, LSA–Civil Code.

(5) In Louisiana there is an implied obligation on the part of an oil and gas lessee to operate the lease for the mutual benefit of lessor and lessee and to refrain from taking any action which will result in draining a substantial quantity of the oil and gas from the lessor's property and producing the same through the lessee's wells on adjacent property belonging to a different lessor, and for a breach of that obligation the lessee is liable to lessor for the royalty on the portion of the oil and gas which he drains from beneath the leased premises, subject of course, to the agreement of lease and the general contract law of the state.

(6) Unless excused or waived, conditions precedent to the maintenance of an action, arising from a lease agreement, must ordinarily be performed or complied with before the action may be instituted, and damages are due only after notice given and demand made in conformity with the provision therefor.

(7) The mere fact that lessors were not aware of the existence of their rights to claim drainage did not relieve them from giving notice and making demand in accordance with the express provisions of the lease, provided that defendant did not actually conceal the fact of drainage or do some other act which tended to hinder, prevent, or impede plaintiffs from ascertaining knowledge of the true facts.

An order in conformity with this opinion should be presented.