432 F.2d 165
 Floyd WILLIAMS, Frederick C. Williams, et al., Plaintiffs-Cross Appellees,
I. R. Price, Edward H. Taussig and Edwin F. Gayle, Plaintiffs-Appellants-Cross Appellees,
v.
HUMBLE OIL & REFINING COMPANY, Defendant-Appellee-Cross-Appellant.
 No. 26968.
 United States Court of Appeals, Fifth Circuit.
 September 30, 1970.
 Rehearing Denied and Rehearing En Banc Denied December 8, 1970.
 
 COPYRIGHT MATERIAL OMITTED Victor A. Sachse, Fernando J. Freyre, Victor A. Sachse, III, Baton Rouge, La., Moise S. Steeg, Jr., Jacqueline McPherson, Steeg & Shushan, New Orleans, La., Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiffs-appellants and cross appellees.
 Bernard J. Caillouet, Lancelot P. Olinde, H. H. Hillyer, Jr., R. King Milling, New Orleans, La., for Humble Oil & Refining Co.; Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel.
 Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.
 WISDOM, Circuit Judge:
 
 
 1
 This is a class action filed by plaintiff landowners[1] against Humble Oil & Refining Company, their mineral lessee, seeking an accounting for the alleged drainage of oil and gas from beneath their leased premises caused by Humble's operations on adjoining premises. In the alternative, the plaintiffs seek damages for the alleged breach of Humble's implied obligation to exercise reasonable diligence to protect their property from drainage. Federal jurisdiction is based upon diversity of citizenship under 28 U.S.C. § 1332. The principles therefore to be applied in this case are determined by the law of Louisiana. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.
 
 
 2
 After protracted preliminaries, Humble moved for summary judgment. The district court concluded that the plaintiffs were not entitled to an accounting and therefore granted Humble's motion for summary judgment on that issue. The court denied Humble's motion for judgment on the issues relating to the cause of action for damages.[2] Williams v. Humble Oil & Ref. Co., E.D. La. 1968, 290 F.Supp. 408. The plaintiffs appealed of right. Humble appealed under 28 U. S.C. § 1292(b) from that part of the district court's order denying its motion for summary judgment. We affirm.
 
 
 3
 In 1933 the Federal Land Bank of New Orleans granted an oil, gas, and mineral lease to I. R. Price, one of the plaintiffs, covering the Williams property in Acadia Parish, Louisiana. The lease was on a printed form and contained provisions then in common use. Price, a lease broker, acted as an agent for Humble; indeed, he soon assigned the lease to Humble. With the use of Humble's prepayment of two years rentals, Price persuaded the Land Bank to sell the leased premises back to the Williams family, from whom it had been acquired. The Land Bank reserved a quarter interest in the minerals. The Williams family granted Price and another plaintiff, Edwin F. Gayle, mineral interests in the leased property in return for their services.
 
 
 4
 In 1937 Humble brought in its discovery well in the North Crowley field now known as Williams No. 1. As of March 1, 1964, Humble had drilled twenty wells on the leased premises at a cost of more than $2,750,000. These wells were drilled in a surface spacing pattern containing approximately twenty acres per well. Production of oil and gas from the leased premises is still continuing, and the plaintiffs and others who share in royalties payable under the 1933 lease have received payments from the date of first production to March 1, 1964, of more than $1,274,000. The gross value of the oil and gas recovered from the Williams property in those years exceeded $10,192,000.
 
 
 5
 The plaintiffs' contentions in this case relate only to the shallow sands, those located above the Frio. As of March 1, 1964, Humble had performed at least 46 workover operations on the wells producing from the shallow sands at a cost of more than $1,000,000. In addition, Humble applied to the State Conservation Department for units affecting certain of the shallow reservoirs, and in 1963 unitization orders were issued pooling the Williams property with other lands overlying the shallow reservoirs.
 
 
 6
 The plaintiffs contend that their property is being drained by Humble's operations on the adjacent premises. The district court found that there are two unit wells, in the production of which the plaintiffs share, situated on adjoining property within 150 feet of the Williams tract. There are no other wells on adjacent premises located within 150 feet of the Williams property. Nevertheless, the plaintiffs urge that Humble should have taken steps — either by multiple completions or forced pooling — to prevent their land from being drained and that those steps would have been economically feasible for the company.
 
 
 7
 The questions for review are these: (1) Were the plaintiffs entitled to an accounting? (2) What is the nature and extent of the lessee's implied obligation to protect the leased premises from drainage? (3) Does an express offset provision in the lease preclude the implication of a further duty upon the lessee to protect against drainage? (4) Does the plaintiffs' failure to comply with a notice provision in the lease bar their cause of action for damages?
 
 I.
 ACCOUNTING
 
 8
 The plaintiffs contend that because Humble failed to exercise reasonable diligence to prevent their property from being drained, it must account to them for that fraction of production on the adjacent property that is attributable to the drainage.[3]
 
 
 9
 In granting Humble's motion for summary judgment on this cause of action, the district court held that under Louisiana law the plaintiffs' proper remedy is an action to recover damages. "A creditor, as such, has no right to an accounting in Louisiana." 290 F.Supp. at 412-413. We agree with the result and affirm the judgment. We hold that in the circumstances of this case, the plaintiffs have no action for an accounting. We do not go so far as to say that in Louisiana a mineral lessor is a mere creditor or that mineral lessors never have a right to an accounting from their lessee.
 
 
 10
 Humble's arguments rest on the incontestable principle that a Louisiana landowner neither owns the minerals beneath his land nor has any right to the oil and gas produced on adjoining property. Humble's position is that an accounting is available only to one who has a property interest in the subject matter of the suit.
 
 
 11
 It is quite true that Louisiana adheres to the nonownership theory of oil and gas; thus only upon drilling and reducing the minerals to possession does the Louisiana landowner become vested with ownership. Frost-Johnson Lumber Co. v. Salling's Heirs, 1922, 150 La. 756, 91 So. 207. It is also true that under the rule of capture a landowner may produce as much oil and gas as he can from a well bottomed on his land and need not account to his neighbor if he drains oil and gas from beneath his neighbor's land. Louisiana Gas & Fuel Co. v. White Bros., 1925, 157 La. 728, 103 So. 23; Higgins Oil & Fuel Co. v. Guaranty Oil Co., 1919, 145 La. 233, 82 So. 206. Nevertheless, we consider that these principles are not determinative of the issue. It is unsettled in Louisiana what right the plaintiff must possess in order to maintain an action for an accounting. The landowner's exclusive right to explore his land and drill for oil or his right under a lease to one-eighth of gross production in certain circumstances may be sufficient interests to entitle him to an accounting.[4]
 
 
 12
 It would be a mistake to think that a Louisiana landowner may never compel an accounting by his mineral lessee. Indeed, we have been able to find several oil and gas cases in which Louisiana courts have ordered an accounting. E. g., Fontenot v. Sunray Mid-Continent Oil Co. (La.App. 3d Cir. 1967) 197 So.2d 715; Mire v. Hawkins (La.App. 3d Cir. 1965) 177 So.2d 795; Davies v. Texarkana Crude Oil Co., 1923, 154 La. 424, 97 So. 597; Harris v. J. C. Trahan Drilling Contractor, Inc., La.App. 2d Cir. 1964, 168 So.2d 881; Pierce v. Atlantic Ref. Co., La.App. 3d Cir. 1962, 140 So.2d 19; Bailey v. Meadows, La.App. 2d Cir. 1961, 130 So.2d 501. Each case, however, follows a well-defined pattern, typically an action by the lessor to cancel his mineral lease on the ground of nonpayment of royalties. If the court orders cancellation of the lease, it may also direct the lessee to account to the plaintiff for the royalties earned until cancellation. See Davies v. Texarkana Crude Oil Co.; Fontenot v. Sunray Mid-Continent Oil Co.; Pierce v. Atlantic Ref. Co.; Bailey v. Meadows. Even if the court rejects the lessor's demand for cancellation because nonpayment was excusable, plaintiff is still entitled to an accounting of royalties that have accrued under the terms of the lease. See Mire v. Hawkins; Harris v. J. C. Trahan Drilling Contractor, Inc. Thus at least in oil and gas lease cancellation cases an accounting is ancillary to the action and exists for the equitable purpose of adjusting in one proceeding all the differences between the parties arising from the main cause of action.[5]
 
 
 13
 For many years in Louisiana the existence of a cause of action based on drainage was in doubt. Finally the case of Breaux v. Pan American Petroleum Corp., La.App. 3d Cir. 1964, 163 So.2d 406, established the right of a landowner to recover damages from his lessee for breach of the lessee's implied obligation to exercise reasonable diligence to prevent drainage. The plaintiffs are right, of course, when they argue that Breaux merely held that an action for damages lies; it did not hold that an action of accounting will not lie. Nevertheless, we believe that an action for damages based on drainage and an action for an accounting are fatally incompatible in a way that an action for cancellation and an accounting are not.
 
 
 14
 The district court correctly enumerated the elements of an action for damages that Breaux requires the landowner to prove. 290 F.Supp. at 411. In the ordinary drainage case the plaintiff must prove first that substantial drainage has occurred and that offset wells drilled on his premises could have produced oil and gas from the same reservoirs as those from which production was actually obtained through the draining wells. Second, he must prove that it would have been economically feasible for the lessee to drill such offset wells. Finally, he must prove "with some degree of certainty" the quantity of oil and gas that would have been produced from the offset wells and the value of his share of that production. Breaux v. Pan American Petroleum Corp., 163 So.2d at 415.
 
 
 15
 It is this last requirement that makes an accounting incompatible with an action for damages under the rule in Breaux. By means of an accounting the plaintiffs seek to shift to Humble the burden of proof on the issue of damages imposed on them by Breaux. They would have the court require Humble to calculate and present to them the quantity of oil and gas drained from beneath their land. This conflict, however, does not arise in the situation in which a plaintiff seeks cancellation of a lease based upon nonpayment of royalties. In that case the plaintiff's right to cancellation depends not on the amount of royalties but rather on the lessee's failure to pay any amount of royalties without a valid justification. See Bollinger v. Texas Co., 1957, 232 La. 637, 95 So.2d 132, 136. Thus once the fact of unexcused nonpayment is proved and cancellation awarded, it is appropriate, in order to afford full and complete relief, to require the lessee to account for the accrued royalties. Davies v. Texarkana Crude Oil Co., 1923, 154 La. 424, 97 So. 597, 598.
 
 
 16
 The Breaux case establishes that if the plaintiffs can prove the elements of the cause of action, they are entitled to damages from Humble for breach of its implied obligation to exercise reasonable diligence to protect the property from drainage. But they must prove "with some degree of certainty" the quantum of harm suffered. Since an order of accounting would require Humble to determine the amount of oil and gas drained, it is inconsistent with the rigorous burden of pleading and proof that Breaux places on aggrieved landowners. Thus we conclude that in oil and gas cases the Louisiana courts would confine an action of accounting to that situation in which the lessee unjustifiably fails to pay his lessor royalties produced from wells drilled on the lessor's land.
 
 II.
 
 17
 THE NATURE AND EXTENT OF THE LESSEE'S IMPLIED OBLIGATION TO PROTECT AGAINST DRAINAGE
 
 
 18
 In the alternative, the plaintiffs sued for damages for breach of Humble's implied obligation as their mineral lessee to exercise reasonable diligence to protect the plaintiffs' property from drainage of oil and gas. The district court, denying Humble's motion for summary judgment in relation to the cause of action for damages, reached the following conclusion of law.
 
 
 19
 5. A mineral lessee has a duty to the mineral lessor to act as a prudent administrator of the leased premises. If the lessee is draining oil or gas from beneath the leased premises by a well drilled by the lessee on other property, its duty to act as a prudent administrator may include an implied obligation to unitize the leased premises with those from which production is being obtained, or to drill an offset well, or to effect an offset completion of a well already drilled on the leased premises, if these acts are economically feasible * * * or to do those other things, if any, that a prudent administrator would do under the circumstances. What action a prudent administrator would take under the circumstances is a factual question to be decided by the finder of fact in the light of the relevant evidence. 290 F.Supp. at 411-412.
 
 
 20
 On appeal neither side is satisfied with that conclusion. The plaintiffs urge this Court to hold that as a matter of law a mineral lessee, upon discovery of drainage from beneath the leased premises, has an affirmative duty to unitize the leased premises with those to which the oil or gas is draining, or to inform the lessee of the drainage so that he may seek unitization, or to drill an offset well, or to effect an offset completion of a well already drilled on the leased premises, if these acts are economically feasible. Humble, on the other hand, argues first that the inclusion in the lease of an express provision dealing with drainage precludes the implication of any other obligation to protect the leased property from drainage. Second, Humble argues that as a matter of law in Louisiana the extent of its obligation to protect against drainage is limited to drilling offset wells or completions and that it would be both unfair and unwise to impose any new obligation. We deal with Humble's first contention in Section III of this opinion.
 
 
 21
 The general rule in Louisiana is that the landowner has no cause of action for damages against the owner of the adjoining property or his lessee for drainage of oil and gas from beneath his land. Louisiana Gas & Fuel Co. v. White Bros., 1925, 157 La. 728, 103 So. 23; Higgins Oil & Fuel Co. v. Guaranty Oil Co., 1919, 145 La. 233, 82 So. 206. That rule is based on the concept that oil and gas — fugacious substances — are not subject to ownership in place. Frost-Johnson Lumber Co. v. Salling's Heirs, 1922, 150 La. 756, 91 So. 207. Thus the Louisiana landowner may drill wells on his property and capture as much oil and gas as he can, even though he may draw some of his production from his neighbor's land.
 
 
 22
 A different situation obtains, however, when the party whose production on adjacent premises is also the plaintiff's lessee. In that case a cause of action for damages lies based on the contractual relationship between lessor and lessee and the lessee's codal obligation to act as "a good administrator." In an oil and gas lease the landowner/lessor surrenders to the lessee his exclusive right to drill for oil in return for a percentage share in the gross proceeds of production. When the lessee acquires the lease, he also assumes a number of obligations, one of which is a duty to protect the leased premises from drainage. When drainage does occur, the landowner's judicial remedy is then an action against the lessee for damages or cancellation of the lease for breach of his implied obligation to protect against drainage.[6]
 
 
 23
 For many years the existence of this remedy against the mineral lessee was in doubt in Louisiana.[7] In 1929 in Swope v. Holmes, 169 La. 17, 124 So. 131, the Louisiana Supreme Court granted a landowner cancellation of his lease because the lessee had drilled wells on adjacent property that were draining the leased premises. Yet as late as 1964 it was accurate to say that the Louisiana courts, for one reason or another, had never awarded damages for drainage.[8] Nevertheless, in several cases, although relief was denied, the court assumed the existence of the remedy. E. g., Billeaud Planters, Inc. v. Union Oil Co. of California, W.D.La. 1956, 144 F.Supp. 564, 569, aff'd, 5 Cir. 1957, 245 F.2d 14; Roberts v. United Carbon Co., 5 Cir. 1935, 78 F.2d 39, 42; Coyle v. North American Oil Consol., 1942, 201 La. 99, 9 So.2d 473, 475-476; Louisiana Gas Lands v. Burrow, 1941, 197 La. 275, 1 So.2d 518, 521-522.
 
 
 24
 The issue is no longer an open one in Louisiana. In Breaux v. Pan American Petroleum Corp., La.App. 3d Cir. 1964, 163 So.2d 406, writ denied, 246 La. 581, 165 So. 481, the court said that
 
 
 25
 we know of no reason why a landowner would not be entitled to recover from his mineral lessee the damages which the lessor has sustained as the result of a breach of the implied obligation on the part of the lessee to exercise reasonable diligence in endeavoring to prevent substantial drainage of the leased premises. We think the lessor under those circumstances would have a cause of action for damages for breach of a mineral lease contract just as he would for breach of any other contract. 163 So.2d at 415.
 
 
 26
 If there is no longer any doubt about the existence of the duty, there is still — as the present lawsuit illustrates — question as to the nature and extent of the lessee's obligation to protect against drainage. We hold that on this issue the district court correctly stated the law of Louisiana:
 
 
 27
 [T]he mineral lessee who is leasing adjacent tracts and is producing oil or gas from a well on one tract that drains the other has a duty to act as a prudent administrator in order to protect the owner of the tract being drained by taking such steps as a prudent administrator would take under the circumstances then prevailing. 290 F. Supp. at 422.
 
 
 28
 Whether on a particular set of facts the lessee has breached his duty is a question for the trier of fact. To recover damages for breach of the implied obligation to protect from drainage, the plaintiff in Louisiana must show
 
 
 29
 (1) that substantial drainage has occurred, (2) that the lessee could have prevented the drainage without sustaining an economic loss and (3) and amount of royalties that the landowner would have received had the lessee taken appropriate preventive measures. Id. at 419.
 
 In Breaux the Court declared:
 
 30
 We conclude, therefore, that plaintiffs in this suit have no greater rights and no different cause of action against defendants-lessees simply because the defendants are also the lessees of the adjoining tract of land on which the alleged draining well is located. 163 So.2d at 417.
 
 
 31
 But the fact that the lessee himself is causing the damages has an important bearing on the proof of the lessee's knowledge of the drainage and on the steps the lessee is capable of taking to prevent or diminish drainage.
 
 
 32
 Breaux makes it clear that a cause of action for damages can be predicated as much upon the lessee's failure to seek unitization as upon the more commonplace failure to drill offset wells or completions. In the ordinary drainage case the plaintiff must allege and prove that the lessee could have produced oil and gas from the same reservoir by offset wells or completions drilled on the leased premises and that it would have been economically feasible for the lessee to drill such wells. He must also allege and prove the quantity of oil and gas that would have been produced from such a well and the value of his share of production. The plaintiff may also recover damages, however, if he alleges and proves that the lessee could have created a pooling unit under which plaintiff would have participated in the production from the reservoir, but that he failed to do so. Damages in that case would be limited to the amount plaintiff would have received from such a unit. 163 So.2d at 415-416. Moreover, drilling offset wells, completions, and unitization do not exhaust the possible ways in which the lessee might discharge its duty to protect against drainage. Indeed, if he deems it inadvisable or unprofitable to drill offset wells or unitize the premises, the prudent administrator should perhaps disclose the fact of drainage to the lessor so that he may apply to the Louisiana Commissioner of Conservation for the establishment of a drilling unit.[9] In appropriate circumstances failure to make a full disclosure may provide the basis for a cause of action for damages.
 
 
 33
 In addition to the precedental effect of Breaux, sound policy reasons support the decision not to limit the lessee's duty to protect against drainage by drilling offset wells.[10] Admittedly, the implied obligation to protect against drainage has long been thought of solely in the context of drilling offset wells. The emphasis on that mode of protection was understandable in the early years of the oil industry. The rule of capture effectively precluded resort to the courts to prevent drainage; thus the drilling of a well to offset each of the draining wells on adjacent property was the only method available to lessees to fulfill their obligation. Conservation laws, however, have added at least one other self-help remedy to the lessee's repertoire, forced pooling or unitization. It is reasonable to require that the lessee, as a prudent administrator, utilize all the methods available to him to prevent drainage.[11]
 
 
 34
 To require the lessee in certain circumstances to seek unitization will not place an unfair burden upon him. Indeed, the concept of a duty to unitize is thoroughly compatible with the "prudent administrator" standard governing his conduct with respect to other implied covenants. The lessee may always defend a suit based upon his failure to unitize by showing that a prudent operator would not have formed a unit or that he had attempted without success all reasonable means to establish a unit or that the costs of unitization would not leave him a profit.
 
 
 35
 Moreover, from the point of view of the landowner, recognition of a duty on the part of the lessee to unitize in circumstances in which a prudent administrator would do so can afford significant protection against drainage of valuable reserves. Especially is this so in cases when it would be unprofitable — or perhaps even impossible because of spacing regulations — for the lessee to drill additional wells. In those circumstances the lessee's contribution to the cost of a unit well may be recoverable from his share of unit production, and the lessor will be saved at least part of his mineral reserves. When the lessee himelf is doing the draining on adjacent land, the argument for unitization is even more compelling. The lessor in that case can get adequate protection against drainage without further cost to the lessee, whose drilling costs are already incurred. Thus he need only divide the royalty interest among the pooled landowners. It is true that any recovery of damages by the lessor for the lessee's failure to unitize, coming on top of a full royalty payment to the adjacent landowner, will decrease the lessee's profit — or perhaps turn a marginally profitable well into a losing enterprise. But if the lessee had originally exercised the requisite diligence to prevent drainage, the added "cost" would not have been incurred. As Professor George W. Hardy, III, points out, "if there is a penalty involved here for the lessee, it does not seem unfair because it would have been avoided by due diligence."[12]
 
 
 36
 For these reasons then we hold that the district court's conclusion of law number 5 correctly states the law of Louisiana.
 
 III.
 EXPRESS OFFSET PROVISION
 
 37
 Even if it be conceded that conclusion of law number 5 correctly states the nature and extent of the Louisiana lessee's implied obligation to protect against drainage, Humble argues that its implied duty has been superseded by an express offset provision in the lease. The 1933 lease contains the following sentence:
 
 
 38
 In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within one hundred fifty (150) feet of and draining the leased premises, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.
 
 
 39
 Humble now urges that the inclusion in a lease of an express covenant to drill offset wells under specified circumstances precludes the implication of any different or greater obligation with respect to drainage.
 
 
 40
 After reviewing the principal cases and secondary sources, the district court concluded that the Louisiana courts would not hold that inclusion in the lease of an express requirement to drill offset wells under limited conditions negates any other obligation imposed upon the lessee to protect the leased premises from drainage. 290 F.Supp. at 416. We agree.
 
 
 41
 At the outset it must be recognized that there are no decisions of the Louisiana courts squarely in point. A review of the decisions of other jurisdictions reveals an increasing reluctance to allow displacement of the implied protection covenant by express offset provisions, especially when the lessee is also the operator whose drilling on adjacent land is causing the drainage.[13]
 
 
 42
 The experience of the Texas courts is illustrative. Hutchins v. Humble Oil & Ref. Co., Tex.Civ.App. — Galveston, 1942, 161 S.W.2d 571, writ ref'd n. r. e., is probably the authority most often cited for the proposition that an express offset provision bars the implication of any other duty to protect against drainage. The Texas courts themselves, however, have limited that principle so that the express provision controls only during the primary term of the lease. See Coats v. Brown, Tex.Civ.App. — Texarkana, 1957, 301 S.W.2d 932, 936; Magnolia Petroleum Co. v. Page, Tex.Civ. App. — San Antonio, 1940, 141 S.W.2d 691, 693, writ ref'd. After that the implied protection covenant — applicable to draining wells no matter how far from the boundary line they are located — becomes effective. Moreover, in the recent case of Shell Oil Co. v. Stansbury, Tex. 1966, 410 S.W.2d 187, the Texas Supreme Court held that an express offset provision in a lease did not limit the lessee's obligation to protect against drainage when the lessee was also the operator whose drilling on adjacent property was causing the drainage. The court concluded that the lessor was entitled to recover damages — notwithstanding the express offset provision — if he could prove that the lessee had caused substantial drainage and that a reasonably prudent operator would have drilled a well on the lessor's land to protect it from drainage. The court specifically overruled Hutchins v. Humble Oil & Ref. Co., insofar as it conflicts with the principle that "a lessee is under a duty to protect his lessor against depletion of the lessor's minerals by the affirmative act of the lessee upon adjacent land." 410 S.W.2d at 188.
 
 
 43
 The same result has been reached in other jurisdictions. In R. R. Bush Oil Co. v. Beverly-Lincoln Land Co., 1945, 69 Cal.App.2d 246, 158 P.2d 754, a California court refused to allow an express offset provision displace the implied protection covenant when the lessee through its operations on adjoining land was draining the lessor's property. The decision was an outgrowth of the court's view that "there is an implied obligation on the part of an oil and gas lessee to refrain from taking any affirmative course of action which will result in draining a substantial quantity of oil and gas from the lessor's property." 158 P. 2d at 758. Thus in the situation where the lessee drained his lessor's premises by production on adjoining lands, the express offset provisions of the lease could have no application.
 
 
 44
 The Supreme Court of Mississippi approached the problem in a similar way in Millette v. Phillips Petroleum Co., 1950, 209 Miss. 687, 48 So.2d 344. The court first recognized that the express lease provision limiting the lessee's duty to drill offset wells precluded resort to any other implied obligation with respect to offset wells. 48 So.2d at 346. Nevertheless, the court held that "there is an implied covenant in a lease of oil property that the lessee will do nothing to impair the value of the lease, and must use reasonable care to protect the lessor from damage or loss by the affirmative act of such lessee." Id. at 347. That responsibility is entirely separate from the traditional duty to drill offset wells — although it may require in some cases the lessee to drill offset wells. Thus an express lease provision absolving the lessee from any duty to drill offset wells will not necessarily relieve him from liability for substantial drainage caused by his own affirmative act."[14] Id.
 
 
 45
 The question then is whether there is any principle in Louisiana jurisprudence similar to the duty expressed in the Stansbury, Bush, and Millette cases that might form the basis for our decision. We believe there is. Article 2710 of the Louisiana Civil Code imposes on a lessee the obligation "[t]o enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease."[15] As Judge Rubin pointed out:
 
 
 46
 These words are no hollow invocation. They imply basic obligations of the lessee arising, as the caption to the Code article tells us, "from the nature of the contract" of lease. The original French text used in the Code of 1808 is even more graphic: The lessee is bound to enjoy the thing leased as "bon pere de famille. * * * It is therefore the duty of the lessee, necessarily implied in the lease, to develop the leased premises properly and to prevent drainage of oil and gas from beneath it, not at all hazards and all costs, but "as a good administrator," just as it is the obligation of a lessee enjoying a store under a percentage rental to operate the store with regard to the lessor's interests as well as its own.
 
 
 47
 Again, as the district court well stated,
 
 
 48
 the lessee's duty to act as a good administrator is not a separate and distinct obligation imposed in addition to the implied obligations announced by the Louisiana courts: it is the basic obligation of the lessee and all of the implied obligations already drawn are merely elaborations of it. 290 F.Supp. at 414.
 
 
 49
 Planiol, commenting on the analogous provision in the French Code, Article 1766, says that as a good administrator the lessee
 
 
 50
 should maintain the thing as it should be done, and take for its preservation the same precautions that a prudent owner would take for his own. For example, if it is a horse which is leased, the lessee should avoid tiring him, to take it on too long a journey, or make it pull too heavy loads; he should care for and nourish it suitably, If it is cultivated land, he should keep it in good condition; if it is a vineyard, give it the care that vines demand, etc. Art. 1766. The lessee should not, therefore, while using the thing according to its destination, make an abusive use of it, such as would compromise its good condition or even its existence.[16]
 
 
 51
 It is settled in Louisiana that mineral leases are construed as leases generally and that the codal provisions applicable to ordinary leases must be applied to mineral leases whenever they are pertinent. Melancon v. Texas Co., 1956, 230 La. 593, 89 So.2d 135, 142; Coyle v. North American Oil Consol., 1942, 201 La. 99, 9 So.2d 473, 478.
 
 
 52
 The duty of the Louisiana lessee to use the leased premises as a good administrator must of course encompass an obligation to protect the premises against any impairment of value threatened by the affirmative act of the lessee himself. An obligation as basic as this one to the protection of the lessor can not be displaced by the insertion in the lease of an express provision relating solely to the establishment of offset wells.
 
 
 53
 Several factors lead us to this conclusion.
 
 
 54
 First, lease provisions in derogation of implied obligations are to be strictly construed.[17] Applying that principle to the lease in question, we see that there is only a small area in which the traditional obligations of the lessee are displaced. The lease obligates Humble to drill offset wells whenever production in paying quantities is brought in on adjacent land within 150 feet of plaintiffs' premises, if a reasonably prudent operator would do so under the same or similar circumstances. The district judge correctly observed that the lease "does not expressly negate any obligation on the part of the Lessee to protect The Williams Property from drainage under other circumstances." 290 F.Supp. at 413. Moreover, the lease contains no mention of the possibility of drilling offset completions or seeking unitization or taking any other steps when the lessee himself is causing the drainage. Strictly construed, the lease merely guarantees that in certain circumstances Humble will drill offset wells. When those circumstances are not present, Humble is still obligated to act as a good administrator with respect to the leased premises. It would require a clear and unequivocal clause in a lease to convince the court that the lessor intended to sacrifice that basic obligation owed him by his lessee.[18]
 
 
 55
 Second, when the lessee inserts an express offset provision into a lease, he is, of course, attempting to limit the implied responsibility to protect against drainage that he would otherwise have under the law of the jurisdiction.[19] As a general proposition, when the average landowner reads a lease form containing the usual offset provision, it is reasonable for him to assume that the lessee is shouldering an added responsibility. Although there is no objection to enforcing a clause stating clearly that the lessee is not obligated to offset a well more than 150 feet from the boundary line, "to accomplish this through indirection, by appearing to confer a benefit while taking one away, smacks of fraud or unfair dealing."[20] The element of unfairness is most striking in those leases in which the offset distance has been fixed at a figure equal to or even shorter than that permitted by the Conservation Department's spacing rules; those clauses, if enforced, would — because of the impossibility of there ever being a well within that distance — effectively relieve the lessee of all obligation to protect against drainage.[21] Thus because of the indirection of the usual offset provision and the consequent possibility of misinterpreting its legal effect, such clauses should be, at the very least, strictly construed.
 
 
 56
 Third, we are in agreement with the district court that "the fundamental duties imposed on the parties to a lease by the very nature of their contract must be interpreted in the light of changes in technology and industry practices." 290 F.Supp. at 416. The lease in question was executed in 1933 on Bath's Louisiana Form 12A. The provision obligating the lessee to drill offset wells if draining wells were brought in on adjacent property within 150 feet was boilerplate; for how many years earlier this form and its offset clause had been in use is unknown. In any event, the offset distance of 150 feet may have represented an honest effort in 1933 to estimate the distance at which drainage usually occurs.[22] If so, that estimate reflected the industry's then existing knowledge of drainage. Improvements in technology, however, have made it abundantly clear that drainage can and regularly does occur at distances far beyond 150 feet. Strict enforcement of lease provisions that were reasonable in light of scientific knowledge and industrial practices in 1933 might be wholly unfair in 1963 or more recent years.
 
 
 57
 We hold that the offset provision does not displace Humble's implied obligations. Our holding does not change the nature of the mineral lessee's obligation. His obligation remains the same — to protect the leased premises against impairment by drainage. What must change in light of scientific and technological advances are the steps necessary to satisfy that obligation. To measure a lessee's performance of his duties by industry standards long since discarded or upgraded would undermine the continuing duty of the lessee to act as "a good administrator," the "bon pere de famille."
 
 IV.
 REQUIREMENT OF NOTICE
 
 58
 Humble contends that the plaintiffs' suit is barred as a matter of law because of their failure to comply with the notice provision of the 1933 lease. The last sentence in paragraph 8 of the lease provides,
 
 
 59
 And in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.
 
 
 60
 Rejecting Humble's argument, the district court stated in conclusion of law number 4 that "[t]his suit is not barred as a matter of law by the plaintiffs' failure to give notice of breach or notice of default. Whether or not it is barred is a question of fact to be decided by the jury." 290 F.Supp. at 411.
 
 
 61
 We would go one step further: we conclude that this is a matter to be decided by the court. As a matter of law, we hold that the plaintiffs' cause of action for damages is not barred by their failure to give notice in conformity with paragraph 8 of the lease.
 
 
 62
 In the law of contracts (conventional obligations) a proper distinction exists between the "interpretation" of written instruments and their "construction."[23] "Interpretation" refers to the process of determining the meaning of the words used; that process is traditionally thought to be a function of the jury.[24] On the other hand, the process of determining the legal effect of the words used — once we know their meaning — is properly labelled "construction";[25] it is peculiarly a function of the court.[26] On this point, we agree with Humble that there is nothing in this case for the jury to decide. There is no doubt what words were used — as well as what words were not used — and what those words mean. What is left is for the court to assess the legal effect of the words chosen in the light of the nature of the contract.
 
 
 63
 Notice provisions were originally inserted in mineral leases primarily to protect the lessee against a forfeiture of the lease for breach of some express or implied obligation. Because forfeiture or cancellation is an extraordinary remedy that terminates the lessee's interest it is fair to require that notice, demand, and an opportunity to cure the breach be given the lessee.[27] Thus whenever the lessor has sought cancellation, the Louisiana courts have required strict compliance with the notice requirements of the lease. See, e. g., Vance v. Hurley, 1949, 215 La. 805, 41 So.2d 724; Bollinger v. Republic Petroleum Corp., La.App. 1st Cir. 1966, 194 So.2d 139, writ ref'd, 250 La. 463, 196 So.2d 276 (1967); Fawvor v. U. S. Oil of Louisiana, Inc., La.App. 3d Cir. 1964, 162 So.2d 602.
 
 
 64
 On the other hand, an action for damages threatens no such harsh consequences as termination of the lessee's interest. There is less reason to insist upon notice and demand. Indeed, in the ordinary drainage action notice to the lessee would be superfluous. The harm has already been committed, and no action by the lessee to repair the breach could adversely affect the lessor's right to compensation for past harm.[28] In many cases the fact of injury is already known to the lessee, who has superior knowledge of his own operations, long before it becomes known to the lessor. The lessor's inability to give notice of that which he does not know should not in all fairness bar him forever from recovery for damages already incurred.[29] The oil industry was undoubtedly conscious of these considerations when the standard form notice provision in the instant lease was drafted. Therefore, we hold that failure to comply with a notice provision drafted in this language and in these circumstances was not then intended to and does not now bar an action for damages.[30]
 
 
 65
 We have found no Louisiana decision denying a cause of action for damages for breach of an implied covenant on the ground that the lessor failed to comply with a notice provision in the lease. Both Bollinger v. Republic Petroleum Corp., and Vance v. Hurley, relied on by Humble, were actions for cancellation of the lease. Lease provisions of this type are specifically intended to bar actions for cancellation unless the prescribed notice is first given. Since that is the obvious purpose of the clause, it makes sense in that case to enforce its provisions. In the instant case notice as a prerequisite to an action for damages makes little sense and could not have been intended by the draftsmen in 1933 when they chose the language of paragraph 8.
 
 
 66
 We consider that Billeaud Planters, Inc. v. Union Oil Co. of California, 5 Cir. 1957, 245 F.2d 14, is inapposite. Billeaud was an action for damages for failure to prevent drainage. In that case, however, the lease, drafted in 1944, contains the explicit language, "all [the lessee's] obligations both express and implied". The notice provision has an additional sentence not contained in the Humble lease: "The service of said notice and the lapse of sixty (60) days without Lessee meeting or commencing to meet the alleged breaches shall be a condition precedent to any action by Lessor for any cause hereunder." (Emphasis supplied.) 245 F.2d at 16. The Court took this language as establishing the intent of the parties to require notice as a prerequisite to an action for damages. Moreover, as Judge Rubin pointed out, the Billeaud court focused on the failure to drill an offset well, not on the affirmative act of drainage.
 
 
 67
 The conclusion reached in Billeaud is not compelled by the language of the lease.[31] For example, in Texas Oil & Gas Corp. v. Vela, Tex.1968, 429 S.W. 2d 866, the Texas Supreme Court held that a similar clause did not bar an action for damages. Recognizing that the purpose of a notice provision is to protect the lessee against a sudden forfeiture, the court held that the parties "could not have intended that the lessor would be forever barred from recovering damages sustained prior to the giving of notice." 429 S.W.2d at 875. In any event, paragraph 8 of the instant lease contains no such language. Judge Rubin held that the "difference in language may signify a profound difference in intention [between the Billeaud lease and the Williams lease]"; whether it did in fact was to be resolved by the jury. 290 F.Supp. at 419. We hold, as a matter of law, that the difference in language requires a result different from that reached in the Billeaud case.
 
 
 68
 The district court correctly ruled that if paragraph 8 does not apply to this case, it is still necessary to determine whether notice was nevertheless required under the Louisiana Civil Code. The Code distinguishes between "active" and "passive" breaches of a contract. A contract may be breached "either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done."[32] A breach that is passive only requires notice and demand before damages are due,[33] while an active breach does not.[34] Damages for an active breach are due from the moment of the violation. The district court thought it unnecessary at the time to determine whether the classification of a specific breach as active or passive is a question of law or a question of fact. The court did, however, express the opinion that it would be proper to give the issue to the jury, aided of course by appropriate definitions. 290 F.Supp. at 420.
 
 
 69
 This conclusion we believe to be incorrect. Our reading of the cases convinces us that the Louisiana courts approach the active-passive classification problem as a question for the court. See, e. g., Melancon v. Texas Co., 1956, 230 La. 593, 89 So.2d 135; Noel Estate, Inc. v. Louisiana Oil Ref. Corp., 1937, 188 La. 45, 175 So. 744; Broadhead v. Pan American Petroleum Corp., La.App. 3d Cir. 1964, 166 So.2d 329; Bailey v. Meadows, La.App. 2d Cir. 1961, 130 So. 2d 501. That rule, moreover, would seem to be the better view. The classification of a specific breach as active or passive requires a construction of the bare words of the Code in the light of the gloss of past decisions. Defining the terms "active" and "passive" for a jury in accord with the simple language of Article 1931 of the Louisiana Civil Code consistent with the complicated decisions on the subject would tax the jury with drawing a bright dividing line where none exists in the jurisprudence.[35] The chances of arbitrary decision making will be substantially lessened if the court, guided by the Code, decisions and commentaries, should decide whether a specific breach is to be characterized as active or passive.
 
 
 70
 Applying that principle to the instant case, we conclude that the specific violation alleged is an active breach and therefore that the plaintiffs were not required to give notice as a condition to their action for damages. Generally the failure to perform an obligation in an oil and gas lease is a passive breach, which requires notice and a formal demand. See Savoy v. Tidewater Oil Co., W.D.La.1963, 218 F.Supp. 607, aff'd 5 Cir. 1964, 326 F.2d 757; Bonsall v. Humble Oil & Ref. Co., W.D. La.1961, 201 F.Supp. 516, 521, aff'd 5 Cir. 1962, 300 F.2d 150; Touchet v. Humble Oil & Ref. Co., W.D.La.1960, 191 F.Supp. 291, 294; Broadhead v. Pan American Petroleum Corp., La.App. 3d Cir. 1964, 166 So.2d 329, 332. In several cases involving the nonpayment of royalties, however, the Louisiana courts have held that an unreasonable and unjustifiable delay in paying royalties constituted an active rather than passive breach. Bollinger v. Texas Co., 1957, 232 La. 637, 95 So.2d 135; Melancon v. Texas Co., 1956, 230 La. 593, 89 So.2d 135; Pierce v. Atlantic Ref. Co., La. App. 3d Cir. 1962, 140 So.2d 19; Bailey v. Meadows, La.App. 2d Cir. 1961, 130 So. 2d 501. Thus, in some cases at least, a willful failure to perform may amount to action inconsistent with the contract.
 
 
 71
 The Louisiana courts have not as yet had an opportunity to classify a breach of the lessee's implied obligation to prevent drainage. In Breaux the question of notice did not arise. In his dissenting opinion, Judge Tate assumed that such a breach was passive, as are failures to act generally. Nevertheless, he acknowledged the possibility that the breach may have been active because the lessee himself was doing the draining through wells drilled on the adjacent premises. 163 So.2d at 421. Professor Hardy has also made the suggestion that when drainage is caused by the operations of the lessee on adjoining property, notice is unnecessary.[36] In that situation the lessee has not merely failed to perform his duty to protect against drainage; he has also knowingly and affirmatively acted in a manner inconsistent with that obligation. The action of the common lessee in this regard is analogous to the wilful conduct that characterized the nonpayment of royalty cases. Just as in Bollinger, Melancon, Pierce, and Bailey, the lessee's action here should be viewed as an active breach of his lease obligations.
 
 
 72
 In Billeaud Planters, Inc. v. Union Oil Co. of California, this Court characterized the lessee's failure to prevent the drainage that he was also causing as "only a passive breach of contract." 245 F.2d at 18. The statement was purest dictum, however, inasmuch as the lessor's cause of action was held to be barred by his failure to comply with an express notice provision in the lease. In addition, the Court cited only a 1910 construction contract case[37] as authority for its conclusion.
 
 
 73
 We conclude that the Louisiana courts would find the analogy of the Bollinger, Melancon, Pierce, and Bailey cases persuasive and hold that the lessor's action for damages is not in the circumstances of this case barred by his failure to give notice to his lessee. Necessarily, we also conclude that the Louisiana courts would characterize as "active" the lessee's failure to prevent the drainage that he is in fact causing by his own operations on adjoining property.[38]
 
 
 74
 Affirmed as to the result reached by the district court and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 As the title of this case indicates, two Williamses and three Freelands were also plaintiffs and appellants. The Williamses and the Freelands have had the action voluntarily dismissed as to their interests. The remaining plaintiffs in this class action are Messrs. Price, Taussig and Gayle, who are mineral or royalty owners. The class was composed of some 76 mineral and royalty ownersSee Williams v. Humble Oil & Ref. Co., E.D.La.1964, 234 F.Supp. 985.
 
 
 [2]
 These issues are: (1) Notice as a prerequisite to the action; (2) the effect of the express offset provision of the lease; (3) recognition of the lessee's implied obligation to protect the lessor against drainage
 
 
 [3]
 These plaintiffs argue that Humble by its tardy applications for unitization declared that it is taking oil and gas from the plaintiff's land through wells it drilled on other land. Humble accounts for oil and gas taken since unitization. The plaintiffs contend that it should also be made to account for oil and gas so taken and so taken to its knowledge before it made the fact known through unitization applications
 
 
 [4]
 In McCoy v. Arkansas Natural Gas Co., 1932, 175 La. 487, 143 So. 383, the Supreme Court of Louisiana stated that the owners have an exclusive right to drill and reduce minerals to possession and that that right is as well entitled to the protection of the law as is the ownership of corporeal property
 In a number of ways the Conservation Law of Louisiana (Act 157 of 1940-R.S. 30:1, et seq.) has recognized the incidents of ownership with respect to oil and gas before its production. For example, "Owner" and "producer" are defined in Section 3 as follows:
 "(8) `Owner' means the person who has the right to drill and produce from a pool and to appropriate the production either for himself or for others.
 "(9) `Producer' means the owner of a well capable of producing oil or gas or both."
 
 
 [5]
 Authority for the equitable adjustment of the parties' differences can be found in Article 21 of the Louisiana Civil Code: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."See Miller v. Kellerman, W.D.La.1964, 228 F.Supp. 446, 464. In that case Judge Hunter also found support for the accounting in Article 1965: "The equity intended by this rule is founded in the christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that no one ought to enrich himself at the expense of another. When the law of the land, and that which the parties have made for themselves by their contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity." See also Art. 2037: "Manner of performance of conditions. Every condition must be performed in the manner that it is probable that the parties wished and intended that it should be."
 
 
 [6]
 See Arata, Louisiana Law of Drainage, in Eleventh Ann. Inst. on Mineral Law 46, 47 (1964).
 
 
 [7]
 Hardy, Drainage of Oil and Gas From Adjoining Tracts — A Further Development, 6 Nat.Res.J. 45 (1966)
 
 
 [8]
 Arata,supra, note 6, at 51. See also Billeaud Planters, Inc. v. Union Oil Co. of California, W.D.La.1956, 144 F.Supp. 564, 569, aff'd, 5 Cir., 1957, 245 F.2d 14.
 
 
 [9]
 Under La.Rev.Stat. § 30:6, subd. F the lessor himself may seek a hearing to determine whether a drilling unit should be formed. Because administrative relief is thus available to both the lessor and lessee, it could be argued that the lessee should not have to assume the burden of applying for unitization. Professor Hardy, however, points out the weakness of this argument:
 one of the principal motivations of any lessor in executing a lease contract is to shift the burdens of development and administration to the lessee. Therefore, the mere fact that the possibility of applying for unitization is open to the lessor should not alter the basic obligation of the lessee in this regard.
 Hardy, note 7, at 48-49 n. 13.
 
 
 [10]
 Many of the arguments that follow have been articulated in two enlightening articles on theBreaux decision by Professor George W. Hardy, III, of the Louisiana State University School of Law. See Hardy, The Work of the Louisiana Appellate Courts of the 1963-64 Term — Mineral Rights, 25 La.L.Rev. 360 (1965); Hardy, Drainage of Oil and Gas From Adjoining Tracts — A Further Development, note 7.
 
 
 [11]
 Cf. George, The Impact of Conservation Laws and Decisions Upon the Mutual Obligations of the Mineral Lease, 24 La.L.Rev. 571, 576 (1964).
 
 
 [12]
 Hardy, Drainage of Oil and Gas From Adjoining Tracts — A Further Development, note 7, at 58
 
 
 [13]
 See 5 H. Williams & C. Meyers, Oil and Gas Law § 826.3, at 206.2 (1969); Malone, Problems Created by Express Lease Clauses Affecting Implied Covenants, in Second Ann. Rocky Mt. Mineral Law Inst. 133, 148-54 (1956).
 
 
 [14]
 Summarizing Millette, one author has said: "* * * In sustaining the recovery of damages by the lessor in the trial court, the majority opinion held:
 (1) That the prudent operator rule has no place in a case involving drainage by a common lessee;
 (2) That the duty to drill offset wells and the duty to compensate for drainage are entirely separate, and that an express clause affecting the offset well obligation does not necessarily affect the duty to compensate for drainage, and,
 (3) That the prudent operator rule applies only to the obligation to compensate for drainage.
 In reaching its conclusion the majority also launched a new implied covenant, noted above, which it found to exist under the circumstances. The covenant was variously stated as:
 (1) `The obligation of the lessee not to deplete the resources of the lessor,' and,
 (2) `The obligation to conserve the mineral resources of the lessor and to refrain from depletory acts.
 * * * * *
 By way of summary, it may be said that the jealous protection afforded by the courts to the implied covenant to protect against drainage has materially reduced the impact of express clauses upon this covenant. This protection is especially apparent when the drainage results from the activity of a common lessee. In that situation, it appears likely that a remedy will be afforded the aggrieved lessor in some manner, regardless of any express covenant." Malone, note 13, at 152-53.
 
 
 [15]
 Walker, Implied Drilling Obligations in Oil and Gas Leases in Louisiana, 1 Loyola L.Rev. 1, 6-7 (1941); Brown v. Producers' Oil Co., 1914, 134 La. 672, 64 So. 674, 677
 
 
 [16]
 Planiol, Traite de Droit Civil (11th Ed.1939), T. II, No. 1692 (Trans.La. Law Inst.1959), quoted in Rials v. Davis, 1947, 212 La. 161, 31 So.2d 726, a landmark case on the obligations of a Louisiana lessee
 
 
 [17]
 M. Merrill, Covenants Implied in Oil and Gas Leases § 200 (2d ed. 1940); Merrill, Lease Clauses Affecting Implied Covenants, in Second Ann.Inst. on Oil & Gas Law & Tax, 141, 142-43 (1951)
 
 
 [18]
 See Walker, Express Clauses in Oil and Gas Leases Affecting the Usual Implied Obligations of the Lessee, 13 Miss.L.J. 292, 302 (1941).
 
 
 [19]
 Caldwell, Standard Provisions in Louisiana Mineral Lease Forms and Variations Thereof, 11 La.B.J. 185 (1963); Walker, note 18, at 305
 
 
 [20]
 5 H. Williams & C. Meyers, Note 13, § 826.3 at 206
 
 
 [21]
 Id.
 
 
 [22]
 Bath's Form 42 CPM-New South Louisiana Revised Six (6)-Pooling, currently in favor with South Louisiana operators, sets the offset distance at 330 feet. Caldwell, note 19, at 190-91. Then there is the additional provision "it being provided however, that lessee shall not be required to drill any offset wells unless the well on adjacent land is within 330 feet of any line of the lands hereunder, nor shall such offset well be necessary when said lands are being reasonably protected by a well on the leased premises or land pooled therewith (all or any part thereof)." An interesting feature of this provision is that at the present time there is no such thing as a well within 330 feet of any line of the leased premises because the Commissioner of Conservation Statewide Order 29-E specifically prohibits drilling wells within 330 feet of any property line. In a situation where the leased premises are suffering substantial net drainage, beyond question, from a robber well located more than 330 feet from the leased premises, it may be wondered whether the courts will hesitate to find that an obligation to offset exists despite this provision of the printed formId.
 
 
 [23]
 See 3 A. Corbin, Contracts § 534 (1960); 4 S. Williston, Contracts § 602 (Jaeger ed. 1961); ALI, Restatement (Second), Contracts § 226, Comment c. (Tent.Draft No. 5, Mar. 31, 1970).
 
 
 [24]
 Both Professors Corbin and Williston, however, discern a trend toward the interpretation of written contracts by the court. 3 A. Corbin, Contracts § 554, at 225 (1960); 4 S. Williston, Contracts § 616, at 649 (Jaeger ed. 1961)
 
 
 [25]
 3 A. Corbin, Contracts § 534 (1960)
 
 
 [26]
 Id. § 554.
 
 
 [27]
 See 4 H. Williams, Oil and Gas Laws § 682, at 334-35 (1969); M. Merrill, note 17, § 192, at 421.
 
 
 [28]
 4 H. Williams, note 27, § 682, at 335
 
 
 [29]
 M. Merrill, note 17, § 192, at 421
 
 
 [30]
 Our conclusion that the notice provision in the 1933 lease was not intended to bar an action for damages for breach of the implied protection covenant is further strengthened by placing the issue in historical perspective. Recall that in 1933 the mere existence of such a damage action was doubtfulSee McCoy v. State Line Oil & Gas Co., 1932, 175 La. 231, 143 So. 58; Caddo Oil & Mining Co. v. Producers' Oil Co., 1914, 134 La. 701, 64 So. 684. It is therefore highly unlikely that the notice provision in the 1933 lease was intended to bar an action that, to the best of anyone's knowledge, probably did not even exist in Louisiana.
 
 
 [31]
 For criticisms of the decision of this Court inBilleaud, see M. Merrill, note 12, § 200 (1964 Supp.); Note, 18 La. L.Rev. 354 (1958).
 
 
 [32]
 La.Civil Code art. 1931
 
 
 [33]
 Id. art. 1933.
 
 
 [34]
 Id. art. 1932.
 
 
 [35]
 Cf. Smith, The Cloudy Concept of Default, in Twelfth Ann.Inst. on Mineral Law 3 (1965).
 
 
 [36]
 Hardy, The Work of the Louisiana Appellate Courts for the 1963-1964 Term, note 10, at 365; Note, 18 La.L.Rev. 354, 359-60 (1958)
 
 
 [37]
 Godchaux v. Hyde, 1910, 126 La. 187, 52 So. 269
 
 
 [38]
 "* * * On the other hand, it would appear that the lessee is bound, as in any contract, not to do anything inconsistent with its obligations to do. Where the lessee has omitted to accomplish its positive obligations, while wilfully draining from a productive sand underlying the leased tract, he is in a rather poor position to contend that the only fault on his part is passive omission to act. Thus, it is certainly not illogical to assert that the default of obligations to do, coupled with the knowing depletion of sands beneath the leased tract, is an active breach of the lease contract. * * * However, where production from the adjoining lands is fully within control of the lessee, it would appear that drainage from the undeveloped tract is not merely an omission but action inconsistent with the express and implied obligations to develop the leased tract. It can hardly be denied that in this instance the lessee was aware that it was depleting the reserves underlying the leased tract. Protection from liability could have been achieved by compliance with the obligations of the lease contract. It seems inconsistent with civilian ideas of fault as a basis of recovery to state that the lessee was in need of notice of its transgression." Hardy, Note, 18 La.L.Rev. 354, 359-60